# MARYLAND REPORTS.

## DECEMBER TERM, 1858.

## ELIJAH CAREY AND THOS. H. CAREY, *vs.* THOMAS DENNIS AND WIFE, AND OTHERS.

Bonds executed by a father in favor of his sons, and delivered to a *third party*, with directions "to take care of them, and deliver them to his sons, in case he died without a will," are mere voluntary gifts, *revocable* at pleasure, and not *evidences of debt;* and, though delivered to the sons *after* the father's death intestate, cannot have any operation, except as *testamentary papers*.

To authorize a decree for the sale of lands to pay debts under the act of 1785, ch. 72, sec. 5, there must be an *indebtedness existing* in the *lifetime* of the deceased: the debt need not be *payable* in his lifetime, but must be shown to be *existing*.

An instrument in any, form, whether a deed or a bond, where the obvious purpose is that it shall not take effect till after the death of the party making it, is a *will*, and it matters not whether the party, at the time of executing it, intended to make a will or not.

Where an instrument does not operate *inter vivos*, but is made to depend, for its whole operation, upon the event of the death of the maker to consummate it, it can only take effect as a testamentary paper.

To vest any interest in the obligee, or, in other words, to create a *debitum in presenti*, a *delivery* of the bond, in the *lifetime* of the obligor, to the obligee, or to some one for his use, is necessary.

Delivery is essential to the validity of every deed; it need not be made directly to the party who is to take, but may be made to a third person, to hold for him as *his trustee;* in such a case there is a present interest vested, the delivery being regarded in law as if made to the party himself.

But bonds placed in the hands of a third party as the *agent* of the obligor, and not intended to be delivered, and not, in fact, delivered to the obligees until after the death of the obligor, are not *debts*, but in the nature of testamentary papers.

In such a case, the party in whose hands the bonds were placed, is the mere *agent* of the obligor, and such agency is *revoked* by his death, and cannot afterwards be executed, and the *subsequent* delivery of the bonds to the obligees, is a void act, which vested no right in them as *creditors* of the obligor.

APPEAL from the Equity Side of the Circuit Court for Worcester county.

This was a creditors' bill filed on the 17th of November 1854, by the appellants, two of the sons and heirs at law of Levin Carey, deceased, against the appellees, his administrator and other children and heirs at law, for the sale of the deceased's real estate, to pay his debts.

. The bill alleges that Levin Carey was, in his lifetime, indebted to the complainant Elijah in the sum of $12,000, and to the complainant Thomas in the sum of $10,000, on his certain bills obligatory, dated the 9th of December 1853, which are exhibited with the bill, and being so indebted, and having real and personal estate of great value, died intestate in the year 1853, leaving as his children and heirs at law, Joseph Carey, Nancy, wife of Thomas Dennis, Mary, wife of Peter L. Davis, Sophia T. Carey, and the complainants, all of full age, to whom his real estate has descended; that letters of administration have been duly granted to Joseph Carey, who, in virtue thereof, has possessed himself of the deceased's personal estate of great value; but complainants "are informed and believe that the same is not sufficient to discharge all the debts due and owing by the said Levin Carey, at the time of his death," and are advised that any deficiency in said personal estate ought to be supplied by a sale of the real estate of their aforesaid debtor. The bill then prays for a sale of the real estate accordingly, and for general relief.

The obligations filed as exhibits with the bill, were written upon paper duly stamped, and the following is a copy of that in favor of Elijah Carey, the one in favor of Thomas H. Carey being precisely the same, except the name of the obligee and the amount, $10,000 instead of $12,000:

"$12,000.00.  For value received, I bind myself, my heirs and assigns, &c., to pay or cause to be paid to Elijah Carey,

DECEMBER TERM, 1858.            3

Carey, et al., vs. Dennis & Wife, et al.

his heirs, &c., &c., the sum of twelve thousand dollars, with interest from the date until paid; as witness my hand and seal, this ninth day of December, eighteen hundred and fifty-three.                                      LEVIN CAREY, (Seal.)

Testes,—Hillary R. Pitts,       1853, Decm. 9th.
          Solomon Carey."

Dennis and wife, and Davis and wife, in their answer, deny that these papers ever were the bills obligatory of said Levin, or were ever obligatory on him, or created any indebtedness on his part to the complainants, or that they were ever either actually or virtually delivered by him to the complainants, or that they ever became obligatory on him in his lifetime, or upon the respondents since his death, or that the real estate which has descended to them is liable to be sold for the payment of the sums of money mentioned therein, or any part thereof. They also deny that the said Levin ever received from the complainants, or either of them, any valuable consideration for the sums of money mentioned in said papers, or any part thereof, and wholly deny that the same, or any part thereof, was a just claim against the said Levin, in his lifetime, or is a just claim against the respondents, or the real estate which has descended to them from the said Levin. They admit that he died intestate as to his real estate, leaving as his children and heirs at law the parties whose names, ages and marriages are correctly stated in the bill, and that Joseph Carey had administered upon the personal estate of the deceased, but they deny that said personal estate is insufficient to discharge all the debts due and owing by the deceased at the time of his death, and also deny that this court has any power or jurisdiction to decree the sale of the real estate so descended to the respondents, for the payment of said pretended claims, or either of them.

Joseph Carey, in his answer, admits the allegations of the bill to be true, and submits to such decree as may be right.

Sophia T. Carey, in her answer, admits that the names, ages and intermarriages of the children and heirs at law of her father, Levin Carey, are truly stated in the bill, and that administration on his personal estate has been granted to Joseph

Carey, but says she knows nothing of her father's indebtedness to the complainants, on the bills obligatory mentioned in the bill of complaint, or of any deficiency of his personal assets to pay his debts, and is willing to submit to such decree as may be right.

A general replication to the answers was then filed, and a commission issued, under which testimony was taken.

*Solomon Carey*, a witness for the complainants, and a brother of the deceased, proved the execution, by Levin Carey, of these obligations in his presence, and that he, deponent, signed his name as a witness thereto, at the request of said Levin; that Doctor Pitts, Joseph and Elijah Carey were present at the time, and deponent thinks that Thomas Carey was also present, but will not say positively. In answer to interrogatories on the part of the complainants, as to whom the said papers were delivered after their execution, and as to what, if any thing, was said by the said Levin Carey in regard to their execution and delivery, and generally in regard to their preparation, and his business as connected therewith, this witness says:

"Said papers were delivered in a package, with a similar one for $12,000 in favor of Joseph Carey, to me after their execution. Said Levin Carey told me that if he died without a will, to deliver them to his three sons, Joseph, Elijah and Thomas. I went there with Doctor Pitts, the Doctor having told me that my brother wanted to see me. After I got there, and after the usual salutations when persons meet, and after having spoken about the blessings of God towards him, he then told the Doctor he wished him to do some writing for him. The Doctor asked him what he wanted him to write. He said he wanted to make some arrangements for his sons; that if he died without some arrangements, they would be defrauded. He then told the Doctor that he wanted him to draw three obligations, one for Joseph for $12,000, one for Elijah for the same, and one for Thomas for $10,000. The Doctor remarked to him that he supposed he wanted him to write his will, and, in order to do so, had brought a book with a form. He then said he had thought about making a will,

but he could not do it; that it would be impossible to delineate his lands unless he had them run out and plats made of them. He then called on the boys to bring paper, pen and ink, and the stand was arranged for writing. He then told the Doctor that his sons had gone through a great deal of hardship for him, wet and dry, cold and hot, to Milton, Milford, and so on, with the wagon, day and night, and that they had gone through enough to kill a dog; that they had helped him to make the property, and that he could not die a just man and could not die satisfied without doing something for them; that in dying so they would be defrauded, and forever remain so. The Doctor then tried his pen and proceeded to draw a form. The form was drawn and shown to Mr. Levin Carey, and I looked at it too. He asked me if I thought it was drawn right. I told him I thought it was drawn in the usual way of drawing them things. The Doctor then proceeded to draw the three obligations as he had before directed him. The Doctor had drawn one or two of them, and my brother, who was looking oven them, told him that he had made a serious mistake, that he had left out the word 'dollars.' The Doctor took it and interlined the word 'dollars' upon my brother having called his attention to the mistake. This error occurred in the note to Joseph, and the interlineation was made before the paper was executed. After they were all drawn and examined by the old man, he signed them, and while signing each he said, 'I acknowledge this to be my hand and seal, for the true intent and purpose therein mentioned.' He called the boys to take them and see if they were right. Joseph and Elijah were present; I do not know whether Thomas was or not. Elijah took them and looked at them, and said I believe they are right. Levin Carey said that Sophia had been with us and remained with us all the while, and that her health is not as good as the others, and she ought to have more than the other girls. After dinner, when the notes had been signed, sealed and passed to me, I asked him if he had forgotten Sophia? He said no; that he had not forgotten any of the girls; that they would all get some property. Previous to this time, he said that after that he supposed there would be some $6000 to

divide among them.   About the time he was giving the obli-
gations, he was speaking about their bearing interest from the
date, or something about that.   I then asked him if he in-
tended to redeem them in land, and he made no reply.   I re-
peated that question two or three times, and after the' second
or third time, he remarked that his sons-in-law were shrewd
fellows, and said that he wished his sons to have the full value
of the obligations.   I do not think the obligations had been
signed when I asked him this question.''

This witness, also, in his examination in chief, proved that
Nancy lived with her father till she was married; that Mary
lived with her uncle most of the time from twelve or fourteen
years of age till her marriage, and in answer to the *tenth* in-
terrogatory says, ''that deponent became satisfied there was no
will, and he delivered them to Joseph, Elijah and Thomas,
each, the note that was payable to him on its face.''

On cross-examination, this witness proved that for the last
twenty-six years the family of the deceased consisted generally
of his wife and part of his children; Joseph, Elijah, Thomas
and Sophia were there most of that time; Nancy was also
there till she married; Mary went, when she was twelve or
fourteen years of age, to live with her uncle, and so went, as
witness believes, with the approbation of her parents; Sophia
lived with her father till his death.   He also proved that the
daughters labored in the family in household business, doing
kitchen and house-work, and also on the farm, while they
lived with their father; witness has seen them at work in the
field dropping corn, stripping blades, and dropping beans and
peas; that Joseph did not live in the house with his father
part of the time for the last twenty-six years, but lived on an
adjoining farm, which actually belonged to him, but from
which his father had all the proceeds, and the control of, and
owned the stock on it—so deceased told deponent; that the
deceased also left a widow, who is still living.

*Doctor Hillary R. Pitts*, a witness for the complainants,
also proved the execution by Levin Carey of the obligations
in question, and that deponent signed his name as a witness
thereto, at the request of the said Levin; that Solomon Carey

was present, and that Elijah Carey was also present, and remained there, as witness believes, all the time of the transaction; he has no recollection of any one else being present.   In answer to the same interrogatories which were propounded to Solomon Carey, this witness says:

"The papers were delivered to Solomon Carey, after their execution, by Levin Carey, who requested him to give them to his sons, in case he died without a will.   I received a message from the said Levin Carey the day before the execution of these papers, to go the next day to see him, that he had some particular business for me to transact.   I went the next day.   After being there some time, Mr. Levin Carey introduced the subject to me himself, and stated that he wanted to give his boys certain amounts, and proposed to do it by giving his notes, (I don't recollect that he mentioned the amounts at the time,) and asked me if I thought it would be good.   I replied that I did not know to the contrary.   He then asked me to draw him a note.   I drew him one, as a form, on unstamped paper, and handed it to him for his examination.   He read it, and approved of it, and handed it to his brother Solomon, who also read it, and approved of its form.   Stamped paper was then furnished, and at the request of Levin Carey, I drew three notes on the stamped paper, and inserted the amount of $12,000, as directed by Levin Carey, in each of the two in favor of Elijah and Joseph, and $10,000 in that in favor of Thomas, and then handed them to Mr. Levin Carey, for his inspection.   He read them, got up out of his bed, went to the table where I wrote the notes, and signed them, and while signing each he made the remark, 'I acknowledge this to be my hand and seal, for the full intent and purpose therein mentioned.'   After he had signed the notes, Mr. Solomon Carey and myself were called upon by him to witness them, which we did.   Mr. Levin Carey then delivered all three of the notes to Solomon Carey, with the request that he wanted him to take care of them, and deliver them to his sons, in case he died without a will.   Before, during, and after the preparation of these notes, Mr. Levin Carey stated to me that he was induced to give his sons these amounts because he thought

they were entitled to them; that they had labored very hard for him through life; had done a great deal for him, and that he could not die satisfied without giving to them these amounts. He either stated that one or more of his sons were now between the ages of thirty and forty years, and that he had done very little for them, and that they had done a great deal for him. He stated a great deal of hardships they had gone through for him, but this deponent does not recollect what they were. After the delivery of the notes as aforesaid, this deponent asked the said Levin Carey, if he recovered, whether he intended to revoke these notes? deponent asked the question two or three times, to which the said Levin Carey made no reply."

It was admitted that at the time of the execution of these papers, as deposed to by the above witnesses, Levin Carey was sick, and that he died of the same sickness.

The complainants also offered in evidence the administration account and proceedings in the Orphans Court, showing a balance of about $3000 of personal property in the hands of the administrator, due the estate, after paying debts other than these obligations, which balance said court ordered the administrator to retain, to meet the claims upon these obligations, and also that of the administrator, Joseph Carey, for $12,000, all of which had been presented against the said personal estate, and the payment of which was resisted by some of the distributees and heirs at law of the deceased.

A number of witnesses on both sides were then examined as to the quantity and value of the real estate of the deceased. From their evidence it appears that he owned about three thousand acres of land in Worcester county, lying in a body; that a comparatively small portion of it was cleared and cultivated, the residue being cedar, cypress and gum swamp. By averaging the testimony of all the witnesses as to their estimates of its value, it did not exceed $30,000.

The defendants, Dennis and wife, and Davis and wife, filed exceptions to the bill, upon the ground that it contains no sufficient averment that Levin Carey died without leaving personal estate sufficient to discharge the debts due by him. They

Carey, *et al.*, *vs.* Dennis & Wife, *et al.*

also filed exceptions to the admissibility of all the items of evidence tending to show the amount and value of said personal estate. They also excepted to the admissibility of so much of the deposition of Solomon Carey as states "that after deponent became satisfied there was no will, he delivered them to Joseph, Elijah and Thomas, to each the note that was payable to him on its face." [*Note.*—In the argument of the case in the Court of Appeals, this last exception was rested, upon the ground that there was no *tenth* interrogatory, to which this part of the deposition professes to respond, and no such interrogatory appears in the record.]

The cause having been set down for final hearing, was argued, and the court below (SPENCE, J.) overruled the defendants' exceptions, and delivered the following opinion accompanying his decree dismissing the bill:

"This cause has been fully and ably argued by the counsel on both sides. After an attentive examination of the authorities cited in argument, and others applicable to the case, and a careful consideration of the facts and circumstances disclosed by the testimony, the court is of the opinion that the instruments of writing filed with the complainants' bill, and upon which the demands of the complainants against the estate of the deceased, Levin Carey, solely depend, were signed and sealed, and placed in the possession of Solomon Carey by the deceased, with a testamentary purpose, and were not intended by him to have any effect or operation whatever, until after his decease; that they did not create nor impose any obligation upon the deceased, nor pass any interest to the complainants during the lifetime of the deceased, being imperfect in execution as the deeds of the deceased, for want of a proper delivery. The bill of the complainants must, therefore, be dismissed."

From the decree accordingly passed dismissing the bill, the complainants appealed.

The cause was argued before ECCLESTON, TUCK and BARTOL, J.

2     v. 13.

*Jno. R. Franklin* and *Isaac D. Jones,* for the appellants, argued the following points:

1st. That the proof shows that Levin Carey, in the execution of these bonds, did not *intend* to make a will, but intended them to operate as *legal obligations in presenti;* and that this intention must prevail, unless it contravenes some rule of law. 3 *G. & J.*, 214, *McNulty vs. Cooper.* 1 *Mass.*, 258, *Swett vs. Boardman.* 2 *Ves., Jr.*, 226, *Habergham vs. Vincent.* 2 *Parsons on Cont.*, 7, *note (g.) Ibid.*, 15, *note (y.)* 35 *Eng. Law & Eq. Rep.*, 336, *Alexander vs. Brame.* 2 *Hagg*, 235, *Masterman vs. Maberly.* 1 *Jarman on Wills,* 11, *note* 1. 39 *Eng. Law & Eq. Rep.*, 133, *Palmer vs. Newell.* 5 *Binney*, 490, *Toner vs. Taggart.* They are not ambulatory, and therefore not a will, for a will must be, in *its own nature,* ambulatory and revocable. 1 *Jarman on Wills,* 11. 30 *Miss. Rep.*, 91, *Wall vs. Wall.*

2nd. That these obligations being under seal, import, upon their face, a *sufficient consideration.* 5 *Gill,* 103, *Edelen vs. Gough.* 8 *Md. Rep.*, 118, *Edelin vs. Sanders.*

3rd. That the proof shows that they were founded on a *valuable consideration.* 1 *Gill*, 1, *Stevenson vs. Reigart.*

4th. That the delivery of these bonds by Levin Carey to Solomon Carey, under the circumstances given in evidence, constituted them the obligations of Levin Carey *in presenti,* and made Solomon Carey trustee for the obligees therein named, respectively. 1 *Shep. Touch,* 59. 13 *Johns.*, 285, *Ruggles vs. Lawson.* 4 *Day*, 66, *Belden, et al., vs. Carter.* 2 *Mass.*, 447, *Wheelwright vs. Wheelwright.* 9 *Mass.*, 307, *Hatch vs. Hatch.* 6 *Md. Rep.*, 274, *Cox vs. Sprigg & Wife.* 1 *Wood. & Minot*, 325, *Brown vs. Brown, et al.* 4 *Kent,* 453 and 456, and cases cited in *note (a.)* Even if they were delivered as *escrows,* they would take effect by relation from the first delivery. 5 *Coke,* 85, and cases cited above. And even if Levin Carey had himself retained the custody of these bonds, under the evidence in this cause he would be considered as holding them as trustee for the obligees named therein, respectively, and on his death intestate they would have taken effect as obligations from their date. 5 *Binney,* 490,

*Toner vs. Taggart.* 1 *Atk.*, 625, *Boughton vs. Boughton.* 2 *Vern.*, 476, *Clavering vs. Clavering.* 35 *Eng. Law & Eq. Rep.*, 336, *Alexander vs. Brame.* 2 *Story's Eq.*, sec. 706. 2 *Md. Ch. Dec.*, 21, *Linthicum vs. Linthicum.* 6 *Md. Rep.*, 274, *Cox vs. Sprigg & Wife.* On this point, and that these bonds are not testamentary papers, see also 6 *Gill*, 463, *Hannon vs. Robey*, and the same case in 9 *Gill*, 440; and 6 *Md. Rep.*, 235, *Mayor & City Council of Baltimore vs. Williams.*

5th. That the fact that by the terms of the delivery of these bonds to Solomon Carey, their payment was postponed until after the death of Levin Carey, does not impair their validity as legal obligations. 3 *Yeates*, 389, *Shields & Wife vs. Mifflin's Exers.* 8 *Term Rep.*, 483, 484, *Burgh vs. Preston.* 10 *Adol. & Ellis*, 222, *Roffey vs. Greenwell*, in 37 *Eng. C. L. Rep.*, 99. 1 *Atk.*, 292, *Ramsden vs. Jackson.* 1 *Chitty's Index*, 193. 19 *Conn.*, 7, *Bristol vs. Warner.*

6th. That the allegations of indebtedness and insufficiency of personal estate to pay, contained in the bill, are sufficient, and are fully sustained by the proof. 10 *G. & J.*, 65, *Gibson vs. McCormick.* *Alex. Ch. Pr.*, 251.

For these reasons it is insisted that the decree below is erroneous, and ought to be reversed.

*Oliver Miller* and *William Tingle*, for the appellees, argued the following points:

1st. That there is no proof of indebtedness on the part of Levin Carey, in his lifetime, to the appellants, and to authorize a decree for the sale of a deceased's real estate to pay debts, under the act of 1785, ch. 72, sec. 5, and 1818, ch. 193, sec. 2, there must be proof of indebtedness in his lifetime. 6 *H. & J.*, 65, *Carnan vs. Turner.* 2 *Bland*, 543, *Watkins vs. Worthington.* 3 *Bland*, 359, *Simmons vs. Tongue.* That the papers in this case purporting to be bills obligatory, are *testamentary* papers, and not evidences of indebtedness, and that to ascertain their character you can look *dehors* the papers. It is not necessary that an instrument should be of a testamentary form in order to operate as a will,

provided it is the intention of the deceased that it should ope-
rate after his death.  A deed poll, or an indenture, a deed of
gift, a bond, marriage settlements, letters, drafts on bankers,
the assignment of a bond by endorsement, receipts for stock
and bills endorsed "for A. B.," an indorsement on a note, "I
give this note to C. D.," promissory notes payable by execu-
tors to evade the legacy duty, have been held to be testamen-
tary.   And it is not necessary for the solidity of a testamentary
instrument that the testator should *intend* to perform, or be
aware that he had performed, a testamentary act; for it is set-
tled law that if the paper contains a disposition of the property
to be made *after death*, though it were meant to operate as a
settlement, or a deed of gift, or a *bond;* though such paper
were not intended to be a will, or other testamentary instru-
ment, but an instrument of a different shape; yet if it cannot
operate in the latter, it may nevertheless operate in the former
character.  1 *Wms. on Excrs.*, 85, 86, 320.  1 *Jarman on
Wills,* 12 to 22.   2 *Kent,* 554, 555.   *Modern Probate of
Wills,* 22, 23, 30, 31, 32, 33, 436.   1 *Chitty's Bl.,* 238.   2
*Ves., Jr.,* 204, *Habergham vs. Vincent,* and same case in 5
*Term Rep.,* 92.  1 *Phillimore,* 1, *Thorold vs. Thorold.*  3
*Phillimore,* 317, *Bartholomew, et. al., vs. Henley.   Ibid.,*
209, *Strauss vs. Schmidt.*  2 *Hagg.,* 235, *Masterman vs.
Maberly.   Ibid.,* 428, *Glynn vs. Oglander.   Ibid.,* 554, *In
re Knight.*  3 *Hagg.,* 218, *King's Proctor vs. Daines.*  3
*Curteis,* 787, *Coventry vs. Williams.*  2 *Eng. Law & Eq.
Rep.,* 591, *Jones vs. Nicholay.*  8 *Eng. Law & Eq. Rep.,* 507,
*Gough vs. Tinden.*  1 *Madd. Ch. Rep.,* 103, *Cotteen vs.
Missing.*  3 *Story's Rep.,* 755, *Grattan vs. Appleton, et al.*
4 *New Hamp.,* 434, *Hunt vs. Hunt.*  4 *Hawks,* 141, *Allison's
Excrs. vs. Allison.*  4 *Desauss,* 617, *Milledge, et. al., vs.
Lamar, et al.*  4 *McCord,* 12, *Singleton vs. Brewer.*  1
*Speer's Eq. Rep.,* 256, *Kinard vs. Kinard.*  2 *Kelly,* 31,
*Hester vs. Young.*  3 *Kelly,* 569, *Jackson vs. Culpepper.*  6
*Geo. Rep.,* 515, *Robinson vs. Schly, et al.*  10 *Geo. Rep.,*
506, *Symmes vs. Arnold & Wife.*  2 *Ala. Rep.,* 152, *Dunn
& Wife, et. al., vs. Bank of Mobile, et al.*  23 *Ala. Rep.,*
448, *Walker vs. Jones.*  9 *G. & J.,* 99, *Wareham vs. Sellers.*
5 *Gill,* 506, *Hebb vs. Hebb.*

2nd. That the doctrine of *relation* is not applicable to the case. The act of 1785, ch. 72, sec. 5, contemplates indebtedness in fact in the lifetime of the ancestor, and not indebtedness by fiction, and the heir at law is only liable for an indebtedness in fact by his ancestor in his lifetime. If the ancestor was not, in fact, indebted in his lifetime, his heir is not liable, although he have real assets. *Litt., sec.* 66. *Coke Litt.,* 52, *(b.)* 2 *Thomas' Coke Litt.,* 308, *(top paging.)* Delivery is essential to the validity of a deed, though it is not requisite it should be delivered immediately to the grantee. It may be delivered as an *escrow,* or to a third person *for the use* of the grantee, or *conditionally,* and in such cases the third person will be regarded as a trustee of it for the grantee. But the delivery must be *as the deed* of the grantor *for the use of the grantee,* and the grantor must part with his dominion and control over it, and the third party must be the trustee for the grantee, and not the mere *agent of the grantor.* Here the proof shows that Solomon Carey was the mere *agent* of Levin Carey, to deliver the bonds *after* the death of the latter. Levin Carey never parted with his dominion and control over these instruments; his words, when he handed them to his brother Solomon, were, "I want you to *take care of them,* and deliver them to my sons, *in case I die without a will.*" This was no parting with the control over the bonds, but was merely constituting Solomon as *his agent* to keep them, which agency was revocable by his making a will, or at his pleasure, and which was, in law, revoked by his death. 4 *Kent,* 500, *(7th Ed.)* 1 *Bouv. Institutes,* 345. *Rutherford's Institutes,* 99. *Story's Agency,* secs. 488, 489, and notes. *Shep. Touch.,* 58, 59, 60, 72, in 30 *Law Lib.,* 124, 125, 126, 145, 146, 147. 4 *Brown's Ch. Cases,* 286, *Tate vs. Hilbert.* 1 *Madd. Ch. Rep.,* 103, *Cotteen vs. Missing.* 4 *Cush.,* 92, *Sessions vs. Moseley.* 14 *Conn.,* 271, *White vs. Bailey.* 2 *Gilman,* 565, *Bryan, et al., vs. Wash, et al.* 15 *Wend.,* 663, *Church vs. Gilman.* 8 *Iredell's Eq. Rep.,* 88, *Roe vs. Lovick.* 2 *Barn. & Cress.,* 82, *Murray vs. Earl of Stair.*

3rd. That the application of the doctrine of relation to such a case as this would subvert the rights of widows to their thirds

of the personalty of their deceased husbands, would nullify the tax upon collateral inheritances imposed by the act of 1844, ch. 237, and render futile the statute of wills and laws of probate. 4 *H. & McH.*, 101, *Griffith vs. Griffith.* 4 *H. & J.*, 480, *Coomes vs. Clements.* 5 *G. & J.*, 488, 489, *Hunter vs. Bryson.* 1 *Md. Ch. Dec.*, 337, *Hays vs. Henry.* 2 *Randolph*, 508, *Ruth, et al., vs. Owens.* 34 *Eng. Law & Eq. Rep.*, 462, *Hulse vs. Hulse.* 10 *Conn.*, 486, *Raymond vs. Sellick.* 16 *Verm.*, 212, *Holley vs. Adams.* 24 *Verm.*, 594, 595, *Meach vs. Meach.* 18 *Penn. State Rep.*, 328, 329, *Headley vs. Kirby.* 3 *Barb. Ch. Rep.*, 116, *Craig vs. Craig.*

4th. That in any aspect of the case, the papers purporting to be bills obligatory, must be deemed testamentary in regard to the widow of Levin Carey, and if deemed testamentary in regard to her, they must be deemed so to every purpose. 1 *Jarman on Wills*, 17. 2 *Wms. on Exors.*, 1315. 2 *Vernon*, 612, *Turner vs. Jennings.*

5th. That had the papers purporting to be bills obligatory, been delivered immediately after they were signed to the sons, they would have been but voluntary, and the sons volunteers, and a Court of Chancery would not enforce the payment of them by a sale of the real estate, under the act of 1785, ch. 72, sec. 5, when by doing so the daughters would be deprived of all provision, and that, too, contrary to the intention of the father. 1 *Carter*, 100, *Resor vs. Johnson.* 16 *Penn. State Rep.*, 488, *Zerbe vs. Miller.* 3 *Dev.*, 348, *Williams vs. Barnes.* *Wright's Rep.*, 134, *Willis vs. Dun.* 5 *Watts & Sergt.*, 513, *Candor's Appeal.* *Atherley on Marriage Settlements*, 132 to 143. 2 *H. & G.*, 100, *Black vs. Cord.* 1 *Fonb. Eq.*, ch. 5, sec. 3. 1 *Eq. Cases Abr.*, 18, *pl.* 9. 6 *Md. Rep.*, 284, *Cox vs. Sprigg & Wife.* *Ibid.*, 435, *Haines vs. Haines.* 1 *Peere Wms.*, 60, *Watts vs. Bullas*, and note. 8 *Gill*, 275, *Waters vs. Howard.* 1 *H. & J.*, 224, *Carberry vs. Tannehill.* 5 *Md. Rep.*, 152, *Elysville Manf. Co. vs. Okisko Co.* 1 *Md. Ch. Dec.*, 112, *Waters vs. Howard.* 2 *Md. Ch. Dec.*, 401, *Duvall vs. Myers.* 4 *Gill*, 472, *Geiger vs. Green.* 4 *Md. Ch. Dec.*, 273, *Philpott vs. Elliott.*

6th. That there is no sufficient averment of the insufficiency

of the personal estate to pay debts, and that the court below, therefore, had no jurisdiction to decree a sale of the realty. That there being no sufficient averment of the insufficiency of the personal assets, there was no issue in regard to the sufficiency of those assets, and all the evidence in the case to show such insufficiency was inadmissible, and the court below could not, therefore, have decreed a sale, if the merits had been with the appellants. 7 *G. & J.,* 191, *Berrett vs. Oliver.* 5 *Gill,* 268, *Tomlinson vs. McKaig.* 2 *How.,* 338, *Grignon vs. Astor.* 1 *Ves., Sen.,* 56, *Lord Uxbridge vs. Staveland.* 2 *Comyn's Digest Demurrer.* 6 *Beav.,* 620, 623, *Egremont vs. Cowell. Story's Eq. Pl.,* sec. 241. 1 *H. & G.,* 504, *Baltzell vs. Foss.* 3 *G. & J.,* 153, *Hoye vs. Brewer.* 4 *G. & J.,* 295, *Wise vs. Smith, et al.* 6 *G. & J.,* 446, *Griffith vs. Frederick County Bank.* 6 *Pet.,* 701, *United States vs. Arredondo.*

7th. That there is no competent evidence of the delivery of these papers, purporting to be the bills obligatory of Levin Carey, to the appellants, or either of them, after his death, so much of the testimony of Solomon Carey as proves such delivery having been excepted to, and there being no *tenth* interrogatory, to which it professes to respond. 9 *G. & J.,* 121, *Md. Ins. Co. vs. Bossiere.*

BARTOL, J., delivered the opinion of this court.

This cause has been argued with very great ability and care, and several interesting questions have been presented for the consideration of this court; but in the view which we have taken of the case, after a most careful examination of the authorities cited, and a mature consideration of the main question involved, we are of opinion that the ruling of the Circuit Court is correct, and that the decree ought to be affirmed.

The proceeding was instituted under the act of 1785, ch. 72, sec. 5, which authorizes a Court of Chancery to decree the *real estate* of a deceased party to be sold for the payment of his debts, in case of an insufficiency of his personal assets.

That section provides, "that if any person hath died, or shall hereafter die, without leaving personal estate sufficient to

discharge the debts by him or her due, and shall leave real estate which descends," &c., &c., "the chancellor shall have full power and authority, upon application of any creditor of such deceased person, after summoning," &c., "and hearing as aforesaid, and the justice of the claim of such creditor is fully established, if upon consideration of all circumstances it shall appear to the chancellor to be just and proper that such debts should be paid by a sale of the real estate, to order the whole or part of the real estate so descending or devised to be sold for the payment of the debts due by the deceased."

The provisions of this section were afterwards extended to defendants of full age, by the 2nd section of the act of 1818, ch. 193.

To authorize a decree for the sale of lands under these statutes, it is necessary that there be an indebtedness existing in the lifetime of the deceased. By which we mean, not that the alleged debt must be payable in his lifetime, but that the debt must be shown to be existing. In this case the proof shows that the writings obligatory of Levin Carey, the deceased, which are exhibited as the evidence of his debt, were voluntary gifts, and it has been argued on the part of the appellees, that for that reason alone, if there were no other objection, the complainants are not entitled to enforce their payment by a proceeding under the act of 1785. Upon that question, however, we do not mean to express any opinion, as the case before us does not demand it.

It appears from the evidence in the cause that they were not delivered, nor designed to be delivered to the obligees till after the death of Levin Carey; during his lifetime they were inchoate papers, revocable at his pleasure, not intended by him to constitute any binding obligation upon himself or his estate, or to confer any right upon the obligees, or to have any effect whatever *till after his death.* If this be so, then they are not evidences of debt, but in the nature of testamentary papers.

This principle is abundantly established by the numerous authorities cited by the appellees' counsel, and it is unnecessary for us to refer to them more particularly. In the language of Justice Buller, "the cases have established that an instru-

ment in any form, whether a deed poll or indenture, if the obvious purpose is not to take place till after the death of the person making it, shall operate as a will." *Habergham vs. Vincent*, 2 *Ves.*, *Jr.*, 231.

It has been contended, on the part of the appellants, that the operation of the instrument as testamentary or otherwise, is a question of intention, and that inasmuch as the evidence shows that Levin Carey, at the time of executing these papers, did not suppose he was making a will, they cannot be held to operate as testamentary, without defeating his intention. This argument was urged in the case of *Habergham vs. Vincent*, and is conclusively answered by the learned judge in the opinion from which we have just quoted; he says, (*page* 230,) "But it was argued for the plaintiff that the testator did not intend to make a will when he executed a deed, and therefore it cannot operate as a will. Whether the testator would have called this a deed or a will, is one question; whether it shall operate as a deed or a will, is a distinct question, that is to be governed by the provisions of the instrument. A deed must take place upon its execution, or not at all. It is not necessary for a deed to convey an immediate interest in possession, but it must take place as passing that interest to be conveyed at its execution; but a will is quite the reverse; it can only operate after death."

The rule, as thus expressed by Justice Buller, and as deducible from the authorities, we understand to be, that where an instrument does not operate *inter vivos*, but is made to depend for its whole operation upon the event of the death of the maker to consummate it, then it can only take effect as testamentary. In our opinion, this does not in any manner conflict with the principles announced by the late Court of Appeals, in *Hannon vs. Robey*, 5 *Gill*, 465, and 9 *Gill*, 440; nor with the decision of this court in *The Mayor & City Council of Baltimore vs. Williams*, 6 *Md. Rep.*, 235. In those cases the instruments under consideration were indentures, executed and recorded in the lifetime of the grantor, which were held to operate as deeds, not as testamentary papers.

3     v. 13.

Carey, *et al.*, *vs.* Dennis & Wife, *et al.*

In our opinion, the case before us is wholly unlike those; here, as we have said, the proof establishes that these writings obligatory were executed by Levin Carey for the sole purpose of making provision for his sons, the obligees, to take effect after his death. But whatever may have been the real intention of Levin Carey, it is clear that to vest any interest in the obligees, or, in other words, to create *debitum in presenti*, a delivery of the bills obligatory to the obligees in his lifetime, or to some one for their use, was necessary. Delivery is essential to the validity of every deed. This need not be made directly to the party who is to take, but may be made to a third person to hold for him as his trustee; in such case there is a present interest vested, the delivery being regarded in law as if made to the party himself; upon that principle the case of *Waring's Admr. vs. Edmonds*, 11 *Md. Rep.*, 424, was decided.

But the facts of this case do not bring it within that principle; here the writings obligatory were delivered to Solomon Carey, to be held by him, not as the agent or trustee for the obligees, but as the agent or custodian for Levin Carey, who, so far from parting with his dominion and control over them, expressly reserved the power to revoke them at will. Under these circumstances, the delivery of the papers to Solomon Carey could no more vest an interest in the obligees during Levin Carey's lifetime, than if they had remained in his own possession; for the possession of Solomon Carey, as his agent, was his possession. Nor could the delivery of them by Solomon Carey, after the death of Levin, give effect to them as binding obligations of the deceased.

If we are correct in saying that Solomon Carey, in whose custody the papers were placed, was the mere agent of the deceased, and we think that is the plain conclusion from the evidence, then it is clear, upon principle and authority, that such agency was revoked by the death of Levin Carey, and could not afterwards be executed.

In such a case the doctrine of relation does not apply. It has been held in many cases, and is doubtless the law, that where a deed is delivered as an *escrow* to a third person, to be

delivered to the grantee upon the performance by him of a certain condition, and it be afterwards delivered to the party upon the performance of the condition, such second delivery may, by a fiction, relate back, and the deed take effect from the first delivery, and this has been held even where the grantor has died in the intervening time, or, being a *feme sole*, becomes *covert;* upon the principle *ut res magis valeat,* &c.

But in this case there is no pretence that the bills obligatory were delivered as *escrows*, or that the obligees named therein could entitle themselves to their possession by the performance of any condition, or by any other act on their part. During the lifetime of Levin Carey, they remained subject to his control, and liable to be revoked by his own act. They created no debt in his lifetime, and the delivery to the obligees, after his death, was a void act, which vested no right in them as creditors.

The case of *Wheelright vs. Wheelright, 2 Mass.,* 447, involved questions analogous to those we are considering, and the counsel for the appellants have relied upon it as conclusive of this case. From the distinguished learning of the judge who delivered the opinion in that case, and of the court which decided it, its authority is entitled to very great respect; it has been followed in several of the decisions in other States, which have been cited by the appellants' counsel.

The same questions were also discussed with great ability and decided by the Supreme Court of Georgia, in the case of *Wellborn vs. Weaver,* 17 *Georgia,* 267, which was not cited in the argument, but to which the attention of the court has since been called. In this last case the ruling of the Supreme Court of Massachusetts, in *Wheelright vs. Wheelright,* is examined with much ability, and its correctness questioned.

Without adopting all the conclusions announced in *Wellborn vs. Weaver,* we think that much of the reasoning upon which that case was decided is sound, and it has had great weight in the determination of the question before us.

This case is, however, different in several important features from both of those; here the papers are not deeds of indenture registered in the lifetime of the grantor, or delivered as *escrows;*

they are writings obligatory, voluntary gifts, revocable at his pleasure, placed in the hands of an agent of the obligor, not to be delivered, and, in point of fact, not delivered to the complainants till after his death, and we are of opinion that they cannot be enforced under the act of 1785, as debts due by Levin Carey, or have any operation except as testamentary papers.

*Decree affirmed, without costs.*

(Decided January 27th, 1859.)