MARK AMES, PETITIONER, v. SAMUEL E. KIRBY, SHERIFF.

Argued November Term, 1903—Decided December 29, 1904.

1. Section 65 of the Crimes act of 1898 (*Pamph. L.*, *p.* 812), which prohibits (*inter alia*) the keeping of a place within this state to which persons may resort for poolselling or bookmaking, or for betting upon the event of any horse race, either within or without this state, or for gambling in any form, or aiding, abetting or assisting therein, is violated by the keeping of a resort for gamblers whose wagers are made by means of telegraphic communication with persons outside of the state, although the latter be not violating their own local laws in accepting such wagers.
2. In order to constitute a violation of section 65 of the Crimes act (*Pamph. L.* 1898, *p.* 812), it is not necessary that both parties to the betting transactions shall be within this state.
3. Section 65 of the Crimes act (*Pamph. L.* 1898, *p.* 812) is not in conflict with the interstate commerce clause of the federal constitution, although the section may incidentally operate to prevent interstate wagers by telegraph.

On *habeas corpus.*

Before Justices FORT and PITNEY.

For the petitioner, *Collins & Corbin* and *Charles C. Carlin* (of the Virginia bar).

For the state, *Joseph E. P. Abbott,* prosecutor of the pleas of Atlantic county.

The opinion of the court was delivered by

PITNEY, J. In making return to a writ of *habeas corpus* the sheriff of Atlantic county sets up as a justification for his detention of the petitioner two writs of commitment, issued by a justice of the peace, setting forth that the petitioner is charged respectively with violations of sections 59 and 65 of the Crimes act of 1898 (*Pamph. L., pp.* 810, 812) and is committed to the sheriff in default of bail to await the action of the

grand jury. Petitioner prays for his discharge—*first,* on the ground that the commitments, respectively, do not set forth any violation of the law; and *secondly,* on the ground that if the sections referred to can be so construed as to render petitioner's act criminal, they are obnoxious to the interstate commerce clause of the federal constitution.

If either of the commitments can be sustained against this attack the detention of the petitioner is justified.

Section 65 of the Crimes act declares that any person or corporation that shall habitually or otherwise buy or sell what is commonly known as a pool, or shall make what is commonly known as a book upon the running, pacing or trotting, either within or without this state, of any horse, or shall conduct the practices commonly known as bookmaking and poolselling, or either of them, *"or shall keep a place to which persons may resort* for engaging in such practices, or either of them, or *for betting upon the event of any horse race,* or other race or contest, *either within or without this state, or for gambling in any form, or aiding, assisting or abetting therein,* shall be guilty of a misdemeanor," &c.

One of the commitments shows that a sworn complaint has been made in writing, setting forth that the Old Dominion Telegraph Company is, and for some years past has been, a corporation chartered by and organized under the laws of the State of Virginia, with power and authority to receive and transmit messages and money by telegraph to any point or points within or without the United States for any and all purposes lawful at the place to which said messages or money are transmitted, and holding the certificate of the secretary of state of this state that it is authorized to transact business in this state; that said corporation is engaged in the business of carrying or transmitting communications within this state; that such corporation has an office in the city of Atlantic City in this state; and "that Mark Ames (the petitioner), for said corporation at said office in Atlantic City, for the space of six months last past has habitually received and transmitted by electric telegraph messages and money orders whereby bets

upon the events of horse races were made in the city of Wheeling, in the State of West Virginia, with and through the West Virginia Athletic Association, a corporation organized under the laws of the State of West Virginia, authorized and empowered by the laws of said state to receive and make wagers and bets within that state upon the running, pacing and trotting of horses without said state; and that the said Mark Ames, by means of the premises, did, at the time aforesaid, at Atlantic City aforesaid, keep a place where persons might resort for betting upon the event of horse races without this state, contrary to the sixty-fifth section," &c.

We are clear that this language discloses an offence against the section specified. The argument of petitioner's counsel is that the betting transactions are not shown to have been completed within this state. But section 65 does not require this in order that the offence shall be complete. It denounces as a misdemeanor *the keeping of a place of resort for persons engaged in betting* upon horse races (whether the races be within or without the state) *or for gambling in any form, or for aiding, assisting or abetting therein.* Every wagering contract requires two parties. Each of these parties is engaged in betting. If twenty persons resort to a place in this state to engage in betting, the mischief to them and to the community, when they all bet against some absent party with the aid of the telegraph or telephone, is precisely the same as if the twenty were betting amongst themselves. The evils attendant upon such a resort are not mitigated by concealing the bookmaker or poolseller, nor by placing him at a distant point either within or without the state. The place of resort is a gambling place and the keeper of it is plainly within the condemnation of section 65.

So far as this section is concerned, it is of no consequence that the corporation of West Virginia, "with and through" which the wagering operations are habitually conducted, is engaged in a practice authorized by the laws of that state. Our statute deals solely with that part of the transaction which is carried on within the confines of our own state and its pro-

visions cannot be rendered nugatory by the action or non-action of the legislature of a sister state.

Upon the constitutional question it is, of course, settled by decisions of the United States Supreme Court that the power of congress to regulate commerce among the several states includes a control of the electric telegraph as an agency of commerce. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 *U. S.* 1; *Telegraph Company* v. *Texas,* 105 *Id.* 460; *Western Union Telegraph Co.* v. *Pendleton,* 122 *Id.* 347.

But even the interstate commerce is subject to be occasionally prevented or interfered with by the incidental operation of state laws and regulations established under the reserved police powers of the state; and if these be reasonable in character, not intended as a regulation of commerce but intended to promote the health, peace, good order and welfare of the citizens, such laws and regulations are not invalid in the absence of exclusive legislation by congress upon the subject, although their enforcement may measurably hamper commercial intercourse between the states. This is expressly recognized in the opinion in the Pendleton case (122 *U. S.* 359) and has been recognized ever since the early case of *Gibbons* v. *Ogden,* 9 *Wheat.* 1, 186. See the comments of Chief Justice Marshall upon local inspection laws, quarantine and health laws, pilotage laws, and the like, in *Id.* 203–211. See, also, the concurring opinion of Mr. Justice Johnson, who said (at *p.* 235) : "It is no objection to the existence of distinct, substantive powers that in their application they bear upon the same subject. The same bale of goods, the same cask of provisions, or the same ship that may be the subject of commercial regulation may also be the vehicle of disease. And the health laws that require them to be stopped and ventilated are no more intended as regulations on commerce than the laws which permit their importation are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action, and while frankly exercised they can produce no serious collision."

Recent decisions of the Federal Supreme Court recognize the same distinction.

Thus, in *Plumley* v. *Massachusetts,* 155 *U. S.* 461, a statute of the commonwealth that prohibited the sale of oleomargarine made in imitation of butter was held not to be in conflict with the interstate commerce clause of the federal constitution, although it incidentally prevented the sale of such oleomargarine brought from another state. The opinion of Mr. Justice Harlan cites with approval the decision of this court in *Waterbury* v. *Newton,* 21 *Vroom* 534, and distinguishes *Leisy* v. *Hardin,* 135 *U. S.* 100, which had been deemed by this court to be inconsistent with Waterbury *v.* Newton, as appears from the opinion in *Sternweis* v. *Stilsing,* 23 *Vroom* (at *p.* 519).

In *Hennington* v. *Georgia,* 163 *U. S.* 299, a state law, forbidding the running of freight trains on any railroad on Sunday, although it affected interestate commerce in a limited degree, was held to be a reasonable police regulation, not invalid by force of the federal constitution alone in the absence of legislation by congress upon the subject. See, also, *Lake Shore & M. S. Railway Co.* v. *Ohio,* 173 *U. S.* 285.

In *Missouri, &c., Railway Co.* v. *Haber,* 169 *U. S.* 613, a Kansas statute that gave a civil action against an interstate carrier for bringing into the state cattle that were capable of communicating disease was upheld.

These cases, perhaps, go further than is necessary to sustain section 65 of our Crimes act, for the statutes that were upheld had a direct effect upon interstate commerce. In the case before us the so-called commerce has no existence except such as may arise through an infraction of the local law against gambling. Traffic that has such an origin cannot be legitimate interstate commerce. The local prohibition attaches before any commerce commences.

Federal decisions closely touching upon this phase of the question are *Coe* v. *Errol,* 116 *U. S.* 517; *Kidd* v. *Pearson,* 128 *Id.* 1, and *Geer* v. *Connecticut,* 161 *Id.* 519. In Coe *v.* Errol it was held that goods, the product of a state, intended for transportation to another state, are liable to taxation as

part of the general mass of property of the state of their origin until actually started in course of transportation to the state of their destination or delivered to a common carrier for that purpose. Yet it is obvious that such taxation has a tendency to prevent interstate commerce. In Kidd *v.* Pearson a state law was upheld that prohibited the manufacture and sale of intoxicating liquors within the state for the purpose of transportation beyond the state. And in Geer *v.* Connecticut the United States Supreme Court sustained a state law that forbade the killing of game, or transporting it, or having it in possession within the state, with intent to procure its transportation beyond the limits of the state.

Similar views have been adopted whenever questions of like import have come before the courts of this state. *Waterbury* v. *Newton,* 21 *Vroom* 534; *Standard Underground Cable Co.* v. *Attorney-General,* 1 *Dick. Ch. Rep.* 270, 274; *Benedict* v. *Columbus Construction Co.,* 4 *Id.* 23, 39; *Honduras Co.* v. *Board of Assessors,* 25 *Vroom* 278; *Lumberville Bridge Co.* v. *Assessors,* 26 *Id.* 529.; *Kolb* v. *Boonton,* 35 *Id.* 163.

A like view has been entertained by the courts of other states in dealing with local laws against gaming.

In *Ballock* v. *State,* 13 *Md.* 1; 20 *Atl. Rep.* 184; 8 *L. R. A.* 671; 25 *Am. St. Rep.* 559, it was held that where the conditions of a bond of a foreign government were such as to give it the character of a lottery contract, a prohibition of its sale by state law did no violence to the constitutional provision. The court said: "Such bonds as this should be no more protected in their sale than diseased meat or diseased cattle, which no one would contend could not and should not be restricted and punished."

In *State* v. *Harbourne,* 70 *Conn.* 484; 40 *Atl. Rep.* 179; 40 *L. R. A.* 607; 66 *Am. St. Rep.* 126, a statute prohibiting the business of transmitting money to race tracks without the state, there to be wagered upon horse races, was held not repugnant to the federal constitution. Recent decisions by the courts of Virginia and Alabama are to the like effect. *Lacey* v. *Palmer,* 93 *Va.* 159; 24 *S. E. Rep.* 930; 31

L. R. A. 822; 57 Am. St. Rep. 795; State v. Stripling, 113 Ala. 120; 21 So. Rep. 409; 36 L. R. App. Cas. 81. Lacey v. Palmer is a well-considered case, worthy of careful perusal.

Section 65 of our Crimes act is a *bona fide* measure of police regulation, prohibiting the maintenance of a gambling resort, whether interstate communication be necessary to the gambling or not. It is not intended as a regulation of interstate commerce and only interferes with such traffic as arises out of its infraction.

A statute prohibiting the removal of stolen goods from the state would operate quite as directly to obstruct interstate commerce, but we think no doubt would be entertained concerning the validity of such a prohibition.

We are of opinion, therefore, that the commitment, which is based upon an alleged violation of section 65, justifies the respondent in detaining the petitioner. The latter having entered into bond pending these proceedings, conditioned to abide the order of this court in the premises, the court will hear counsel upon the question of the form of the order.