13 N.J. Super. 172 (1951)
80 A.2d 342
STATE OF NEW JERSEY, PLAINTIFF,
v.
WESTERN UNION TELEGRAPH CO., ET ALS., DEFENDANTS.
Superior Court of New Jersey, Cumberland County Court Criminal Division.
Decided April 2, 1951.
*186 Mr. Theodore Parsons, Attorney-General (Mr. Nelson F. Stamler, Deputy Attorney-General, and Mr. Simon L. Fisch, Deputy Attorney-General, and Mr. George H. Stanger, Prosecutor of Cumberland County, appearing), attorney for the State of New Jersey.
Mr. Robert G. Howell and Messrs. Smith, James & Mathias, attorneys for the defendants, The Western Union Telegraph Co., and Charles H. Frake.
Mr. John E. Selser, attorney for the defendant Leo Link.
HORUVITZ, J.C.C.
Defendants, the Western Union Telegraph Co. (hereinafter called Western Union), Charles H. Frake, manager of the Bridgeton, New Jersey, office of the Western Union, and J.W. Donaldson, alias Leo Link, were indicted by the Cumberland County Grand Jury on June 5, 1950. Five indictments were returned by the grand jury, Nos. 5012 to 5016, inclusive, all emanating from bookmaking charges.
The general story garnered from the indictments is that Frake, the local manager of the Bridgeton, New Jersey, branch office of the Western Union, took and received bets on horses at the said office and relayed them via wire to Donaldson, alias Link, allegedly a bookie from Passaic County, New Jersey. A telegraphic fee was charged for the message which contained the name of the horses, the track, the number of the race, the amount bet and the betting positions, i.e., win, *187 place or show. If success attended the operation, the better received his winnings minus telegraphic charges from the Western Union.
The named defendants move to quash all indictments. Indictment No. 5015 returned against Western Union, Frake and four others cannot be considered at this juncture, for the reason that extradition of the four other defendants has been refused by a sister state, and thus they are without the jurisdiction of this court. No application having been made by the State of New Jersey or the named defendants for a severance, the alleged deficiencies vis-a-vis this particular indictment cannot now be resolved. The other indictments will be considered seriatim. Forty-three reasons are assigned in support of the motions to dismiss the indictments.

No. 5012 (DISORDERLY HOUSE)
This particular indictment charges that Western Union and Charles Frake, on June 22, 1948 and on other days preceding June 5, 1950, maintained a disorderly house contrary to R.S. 2:103-1, where betting and bookmaking were permitted. Attack is made thereon under three grounds.
It is first charged that the indictment fails to state facts constituting an offense under the designated statute. It is here urged that factual specificity is absent and in its stead appears only conclusions of the pleader. On a motion to dismiss, the facts stated in the indictment as constituting the offense must be taken as true. State v. Tachin, 92 N.J.L. 269, 106 A. 145 (Sup. Ct. 1919), affirmed 93 N.J.L. 485, 108 A. 318 (E. & A. 1919); writ of error dismissed, Tachin v. State of New Jersey, 254 U.S. 662, 41 Sup. Ct. 61, 65 L.Ed. 463 (1920); 42 C.J.S., Indictments and Informations, § 214. The motion to dismiss will be denied unless the indictment on its face appears incapable of supporting a judgment of conviction. State v. Riggs, 91 N.J.L. 456, 106 A. 216 (Sup. Ct. 1918), Cf. State v. Shipley, 10 N.J. Super. 245, 77 A.2d 38 (App. Div. 1950).
Inspection of the challenged pleading reveals the required legal particularity. It sets forth, in brief, that the *188 defendants for gain, wilfully and knowingly maintained at premises situate at No. 82 East Commerce Street, Bridgeton, New Jersey, a disorderly house where persons could engage in betting, bookmaking and gambling. Neither imagination nor presumption need be indulged in. The language is plain and unadorned, yet it contains the essential legal requirements. The word "bookmaking" requires no explanation or definition. State v. Morano, 133 N.J.L. 428, 44 A.2d 786 (Sup. Ct. 1945), affirmed 134 N.J.L. 295, 47 A.2d 419 (E. & A. 1946). A place of public resort for persons to bet upon horse racing is a disorderly house. State v. Lovell, 39 N.J.L. 463 (Sup. Ct. 1887).
A telegraph office was never intended to be a spa where devotees of the "sport of kings" could place their bets, and when the plain language of an indictment so charges, an indictable offense is presented.
Research discloses no definition of a disorderly house at common law or in our statute, yet under the cases in our State any house which a jury finds to be open to and frequented by persons who so conduct themselves there as to violate the law and good order, may be a disorderly house. Burdick, Law of Crime, § 909; Russell on Crime (9th ed.), p. 1381; State, v. Williams, 30 N.J.L. 102 (Sup. Ct. 1862); Brown v. State, 49 N.J.L. 61, 7 A. 340 (Sup. Ct. 1886); Bindernagle v. State, 60 N.J.L. 307, 37 A. 619 (Sup. Ct. 1897); State v. Berman, 120 N.J.L. 381, 199 A. 776 (Sup. Ct. 1938).
Reliance by the defendants is had on the case of State v. Solomon, 97 N.J.L. 252, 117 A. 260 (E. & A. 1922). This case is not helpful. There the indictment failed to charge an essential part of the statute upon which it was predicated. Here the crime of disorderly house is one of common law and all essential elements are contained therein. A plain reading of the indictment dissipates any converse suggestion.
This court is cognizant of the admonitions addressed to trial judges by the appellate courts  "Don't quash except on clear and plain grounds." State v. Sweeten, 83 N.J.L. 364, *189 85 A. 309 (Sup. Ct. 1912); State v. Proctor, 55 N.J.L. 472, 26 A. 804 (Sup. Ct. 1893); State v. Johnson, 82 N.J.L. 330, 81 A. 657 (Sup. Ct. 1911); State v. Davidson, Judge, 116 N.J.L. 325, 184 A. 330 (Sup. Ct. 1936); State v. Micone, 134 N.J.L. 177, 46 A.2d 663 (Sup. Ct. 1946); State v. Russo, 6 N.J. Super. 250 (App. Div. 1950). Such grounds are conspicuous by their absence in this case.
It is secondly charged that a paucity of details appears without which the defendants are disabled from adequately preparing their defense. Suffice it to say that if bills of particulars are desired, an avenue of approach to the courts is contained in Rule 2:4-14. See also comment on this Rule in the Tentative Draft. Bishop, New Crim. Procedure, § 643; State v. Hatfield, 66 N.J.L. 443, 49 A. 515 (Sup. Ct. 1901), affirmed 67 N.J.L. 354, 51 A. 1109 (E. & A. 1902); State v. Penna. R. Co., 84 N.J.L. 550, 87 A. 86 (Sup. Ct. 1918); State v. Dolbow, 117 N.J.L. 560, 189 A. 915 (E. & A. 1937); Joseph L. Sigretto & Son v. State, 127 N.J.L. 578, 24 A.2d 199 (Sup. Ct. 1942); State v. Eisenstein, 10 N.J. Super. 497, 77 A.2d 63 (Cty. Ct. 1950).
To buttress this charge, defense counsel cite Linden Park Blood Horse Ass'n. v. State, 55 N.J.L. 557, 27 A. 1091 (E. & A. 1893). In this case the defendant was convicted of the offense of keeping a common gaming house, an offense that was not among the specifications of misconduct that were in the indictment that made the house of the defendant a disorderly one.
The query that there presented itself to the court for solution was described by the court in this fashion: "The crucial test of the inquiry obviously is whether the specifications of the act that constitute the house a disorderly one, are necessary parts of the charge." This, as logic and reason demand, was answered in the affirmative. In the case at bar, we are not dealing with a trial and the court is not called upon to pass on a variance between the proof and the indictment. Neither is it called upon to pass upon generalizations in the indictment which lack a description of the crime of *190 which the defendants are accused. As stated herein under the first ground, the offense charged was certain and identifiable. Other cases cited by the defendants relate to the important and accepted principle of law that the indictment must set forth the facts with such clearness and necessary certainty as to apprise the person accused of the offense of which he stands charged. Such is the law and the present indictment satisfies this principle.
It is further charged under this point that the indictment defies grammatical construction and is unintelligibly drawn. The spine of this indictment can withstand such verbal shivers. True it is that the pleading lacks literary finesse and grammatical nicety, but such is not its function. State v. Sweeten, supra. The crime charged is not statutory; thus, no exact pattern need be followed. The language used is seemingly archaic and tenuous, albeit clear upon examination.
It is thirdly charged that the pertinent statute, R.S. 2:103-1, has no application to the facts in the case at bar for the reason (1) that the intent of the Legislature was to strike at the heart of the professional gambler's means of activity, and (2) that the Western Union does not share in any way from the profits or losses of gambling activities. The reasoning is tortuous. In the first place, the statute specifically refers to ten crimes disassociated with gambling, to say nothing of the common law crimes in the same category, also numbering ten. A plain reading of the statute dissipates the first reason advanced. It provides that "assaults * * * and all other offenses of an indictable nature at common law and not expressly provided for by statute, shall be misdemeanors." Among these common law crimes not provided for by statute are: maintaining a disorderly house (such as is the charge here); barratry; being a common scold; conspiracy (in addition to the statutory crime); eavesdropping; engrossing; forcible entry and detainer; forestalling; libel; obstruction of justice, and suicide. O'Regan & Schlosser, New Jersey Criminal Practice & Procedure, p. 441.
*191 Independent research and study fail to disclose any decisions in the English-speaking world which make it a sine qua non for indictments in bookmaking cases that each defendant must share in the profits and losses. No cases are cited to support this unique theory, and in any event such contention is a legal absurdity. The law is that the permitting of bookmaking may constitute the operation of a disorderly house. State v. Lovell, supra.

No. 5013 (BOOKMAKING)
This indictment contains six counts, and to properly identify the individual counts with the statute, reference must need be made to it. (Interpolated numbers 1 to 5, and 4(a) to (d) inclusive, added to segregate the disjunctive crimes). R.S. 2:135-3, provides as follows:
"Any person who shall habitually or otherwise, (1) buy or sell what is commonly known as a pool, or any interest or share in any such pool, or (2) shall make or take what is commonly known as a book, upon the running, pacing or trotting, either within or without this State, of any horse, mare or gelding, or (3) shall conduct the practices commonly known as bookmaking or pool selling, or (4) (a) shall keep a place to which persons may resort for engaging in any such practices, (b) or for betting upon the event of any horse race, (c) or other race or contest, either within or without this State, (d) or for gambling in any form, or (5) any person who shall aid, abet or assist in any such acts, shall be guilty of a misdemeanor, and punished by a fine of not less than one thousand dollars nor more than five thousand dollars, or by imprisonment in the State prison for not less than one year nor more than five years."
The first count charges that the Western Union and Frake on June 22, 1948, and on other dates preceding April 26, 1950, wilfully, knowingly and unlawfully aided, abetted and assisted J.W. Donaldson, alias Link, and four other named persons "in what is commonly known as a book upon the running, pacing and trotting within and without the state of horses, mares and geldings, thereby aiding, abetting and assisting in the practice known as bookmaking, * * *" contrary to the form of the statute, etc. This count uses the specific language in sections 2 and 5 of the statute.
*192 The second count charges that the said two defendants on the same dates wilfully, etc., aided and abetted the same parties "in the practices commonly known as bookmaking. * * *" This count uses the specific language in sections 3 and 5 of the statute.
The third count was dismissed on motion of the State and need not be considered.
The fourth count charges the two said defendants on the same dates with keeping "a place to which persons might resort for the betting upon the events of horse races. * * *" This count uses the specific language in section 4, phrases (a) and (b) thereof.
The fifth count was dismissed on motion of the State and need not be considered.
The sixth count charges the said two defendants on the same dates with keeping a place at No. 82 East Commerce Street, Bridgeton, New Jersey, "to which persons might resort for gambling in the form of what is commonly known as bookmaking. * * *" This count uses the specific language in section 4, phrases (a) and (d) thereof.
Attack is made thereon under 19 grounds, many of which are repetitious. Each ground which is not repeated will be considered separately.
Criticism is leveled at the first count because the pleader omitted to insert the statutory words "make or take." (See first four words in section 2.) The first count in this indictment, as heretofore stated, avers that the defendants "did aid, abet and assist (the six named persons) in what is commonly known as a book. * * *" Such objection, even if it can be viewed as serious, can be corrected by amendment, Rule 2:4-13. There this very situation is contemplated. The Rule provides that if there is any error in the manner of describing the offense intended to be charged, amendment may be permitted if another or different offense is not charged and the defendant is not prejudiced thereby in his defense on the merits. No new offense will be charged by amendment. Motion having been made by the State at the time of the *193 oral argument to amend on this score, the same was allowed. This course is consonant with the purpose and intent of our new Rules, Rule 2:1-2, and with the statute, R.S. 2:188-6.
The first and second counts are criticized because they fail to charge essential facts of aiding, abetting and assisting. It is argued that particulars are required  that the bare use of the words just referred to constitutes merely the pleader's contention. The general rule is that in an indictment for an offense created by statute, it is sufficient to describe the offense in the words in which the statute describes it, but this rule is based upon and applies only to those cases in which the statute describes the offense with which it has to do. Unless this is so, the mere recital of non-descriptive words from the statute will not constitute, in reasonable completeness, a statement of the offense so as to relieve the pleader from averring all facts that go to make it up. State v. Schmid, 57 N.J.L. 625, 31 A. 280 (Sup. Ct. 1895); State v. Spear, 63 N.J.L. 179, 42 A. 840 (Sup. Ct. 1899); State v. Allgor, 78 N.J.L. 313, 73 A. 76 (Sup. Ct. 1909); State v. Borg, 9 N.J. Misc. 59; 152 A. 788 (Sup. Ct. 1931); State v. Bradway, 118 N.J.L. 17, 190 A. 778 (Sup. Ct. 1937); State v. Augustine, 15 N.J. Misc. 401, 191 A. 805 (Sup. Ct. 1937); State v. Gibbs, 134 N.J.L. 366, 48 A.2d 300 (Sup. Ct. 1946); State v. Jenkins. 136 N.J.L. 112, 54 A.2d 804 (Sup. Ct. 1947), error dismissed, 137 N.J.L. 209, 59 A.2d 372 (E. & A. 1948); State v. McGovern, 136 N.J.L. 115, 54 A.2d 812 (Sup. Ct. 1947); State v. Russo, 6 N.J. Super. 250, 71 A.2d 142 (App. Div. 1950); 31 C.J., § 260, 42 C.J.S., Indictments and Informations, § 139.
Careful inspection of the statute reveals four sections which embrace the various offenses subject to indictment thereunder. The fifth section provides that any person "who shall aid, abet or assist in any such acts shall be guilty of a misdemeanor. * * *" A blank allegation that one aided, abetted or assisted in the violation of "the offenses mentioned in the statute" would be defective because it would not apprise one charged with crime of the offense charged against *194 him. Here we have a contrary situation. The acts with which the defendants are charged with aiding, abetting and assisting in, are delineated with particularity, even though the statutory language in the first four sections is used. This is so because the statute describes the offenses with which it has to do and the statutory words, aiding, abetting and assisting, are descriptive words, as are the offenses set forth in the first four sections.
The particularity is obvious. The nature of the accusation is manifest from the close adherence to the provisions of the statute. The words "wilfully and unlawfully did make and take what is commonly known as a book upon the running of horses, mares and geldings" have been held to have the clarity and certainty of statement required to apprise persons indicted for that misdemeanor of the offense they are called upon to meet. State v. Morano, 134 N.J.L. 295, 47 A.2d 419 (E. & A. 1947); State v. McFeeley, 136 N.J.L. 102, 54 A.2d 797 (Sup. Ct. 1947).
What defense counsel seeks to do is to isolate the words "aid, abet and assist," remove them from their associated surroundings, and say that these words, though following the statutory language, are in and of themselves defective. These three words and the references to the other four sections of the indictment must be construed with reference to each other and are in pari materia. No illumination is required in the reading of the statute. It clearly expresses the legislative purpose to render any person who aids, abets or assists in the perpetration of any of the violations referred to in the first four sections guilty of a misdemeanor; in fact to make the aider and abettor a principal offender. Such action as claimed is impossible of execution, as the law must be applied to the facts of the case and not to a hypothetical situation disassociated from the issue. These three words must be read in conjunction with the offenses contained in the first two counts of the indictment which themselves are contained in sections 2 and 3 of the statute. They were intended to be conjoined with specific offenses. The cases cited by defendants do not *195 sustain their contention. In each instance where the indictment was considered defective, there was uncertainty or ambiguity. Not so here. The statute describes the offenses in terms that in themselves will import with certainty the elements of the offense.
It is next argued that the first two counts of the indictment are defective because the disjunctive statutory words "aid, abet or assist" are charged conjunctively as one offense. Further, that these words are not synonymous, (i.e., the words "aid and assist" are not synonymous with the word "abet"). Therefore, the pleading is in violation of the rule of law that when terms used in a statute are not synonymous they must be charged separately and disjunctively as individual offenses in separate counts. State v. Flynn, 76 N.J.L. 473, 72 A. 296 (E. & A. 1909); State v. Bove, 98 N.J.L. 350, 116 A. 766 (Sup. Ct. 1927). The argument presupposes that the meaning of the word "abet" is repugnant to the meaning of the words "aid and assist." The vice of this criticism is two-fold: First, it consists of the labeling of non-synonymous words as being in the category of words which are repugnant to each other, and secondly, in the improper application of the facts to the law.
The rule is entirely settled, that if a statute makes it a crime to do this or that, mentioning several things disjunctively, the indictment may as a general rule embrace the whole in a single count; but it must use the conjunctive "and" where "or" occurs in the statute, else it will be defective as being uncertain. Bishop, Criminal Procedure 581; Wharton, Criminal Evidence (11th ed.), § 1057. Joyce, Indictments, § 382; People v. Davis, 56 N.Y. 95 (Ct. of Appeals 1894); State v. Price, 11 N.J.L. 203 (Sup. Ct. 1830); State v. Hill, 73 N.J.L. 77, 62 A. 936 (Sup. Ct. 1906); State v. Callary, 108 N.J.L. 462, 159 A. 161 (Sup. Ct. 1932), affirmed 110 N.J.L. 24, 164 A. 20 (E. & A. 1933). There are doubtless instances where the offenses disjunctively set out in a statute are so dissimilar in substance that a separate count for each may be necessary, but where *196 the acts mentioned in the statute all belong to the same transaction and each act represents a phase of the same offense, all may therefore with entire propriety be included in one count. Cf. State v. Hill, supra. When the two words "aid" and "abet" are combined, however, as they usually are, they comprehend knowledge and all assistance, support and encouragement that may be rendered in any way, including signs, words and acts. Burdick, Law of Crimes, supra., p. 304 and see cases cited under note 73 therein. Words and Phrases, vol. 3, p. 65.
In the last-mentioned authority, volume 3, p. 56, there is contained a pointed discussion on this very phase. "It is said in Raiford v. State, 59 Ala. 106, that the words `"aid and abet" are pretty much the synonyms of each other'; and this has doubtless come to be true in the law, though originally a different meaning attached to each. The legal definition of `aid' is not different from its meaning in common parlance. It means to `assist'; `to supplement the efforts of another.' Rap. & L. Law Dict. p. 43. Chief Justice Stone defined the two terms as follows: `The words "aid" and "abet," in legal phrase, are pretty much the synonyms of each other. They comprehend all assistance rendered by acts or words of encouragement or support, or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. If encouragement be given to commit the felony, or if, giving due weight to all the testimony, the jury are convinced beyond a reasonable doubt that the defendant was present with a view to render aid, should it become necessary, then that ingredient of the offense is made out.'" State v. Tally, 102 Ala. 25, 15 So. 722, 737 (Sup. Ct. 1894).
The words "aid" and "abet" are not strictly synonymous, (Cf. State v. Flynn, supra) although they are often used as synonymous. See State v. Tally, 102 Ala. 25, 15 So. 722 (Sup. Ct. 1894); State v. Graham, 62 Io. 108, 17 N.W. 192 (Sup. Ct. 1883); State v. Orrick, 106 Mo. 120, 17 S.W. 176 (Sup. Ct. 1891); State v. Payne, 6 Wash. 563, 34 Pac. 317 *197 (Sup. Ct. 1893); Vogel v. State, 138 Wis. 315, 119 N.W. 190 (Sup. Ct. 1907). To aid is to assist, support, to supplement the efforts of another; State v. Johnson, 220 N.C. 773, 18 S.E.2d 358 (Sup. Ct. 1942); to abet means, literally, to bait, or excite, as an animal, People v. Terman, 4 Cal. App.2d 345, 40 Pac.2d 915 (D. Ct. of App. 1935), and legally means to encourage, counsel, incite or instigate the commission of a crime. State v. Hill, supra.
On this motion, the court is not required to specify what meaning or meanings the Legislature intended to apply to the word "abet" as used in the statute. It is enough to say that for the present purposes the word will be considered as connotative of the part which a participant takes in the commission of one or more of the offenses specified in the first four sections of the statute, and the words "aid, abet and assist" will be considered as belonging to the same transaction, with each act representing a phase of the same offense. Cf. State v. Bartholomew, 69 N.J.L. 162, 54 A. 231 (Sup. Ct. 1903); State v. Hill, supra; State v. Price, supra; O'Regan & Schlosser, N.J. Criminal Practice and Procedure, p. 51; and as every reasonable intendment should be in support of the indictment, such meaning will be ascribed to it in this case. There is, therefore, no repugnancy, and consequently no duplicity, as the latter must depend on repugnancy for its existence. Cf. State v. Bove, supra.
Under this point, the case of Larison v. State, 49 N.J.L. 256, 9 A. 700 (Sup. Ct. 1877), is relied on by the defendants as authority for the proposition that where offenses disjunctively set out in a statute are so dissimilar in substance, a separate count for each is necessary. Here the argument of defense counsel shifts from non-synonymity to dissimilarity in substance as reason for separate counts. In the Larison case, the statute made it punishable to wilfully or wantonly send or convey to any female against her will any indecent letter or communication. The indictment charged that the defendant did "send and convey." The Supreme Court held that this was technically defective because the words "send" *198 and "convey" import a different mode of transmission, and the defect in the indictment was the charging of two distinct and incongruous offenses in one and the same count, resulting in a duplicity in pleading. However, the expression of that principle in that case was obiter dictum, and its legal effect has since been emasculated. Mr. Justice Parker, in the Bove case, supra, in commenting on the Larison case, said: "There may be cases where offenses disjunctively set out in a statute are so dissimilar in substance that a separate count for each may be necessary. In Larison v. State, * * * this condition was said to exist. But this was obiter dictum, the decision turning on the proposition that in any event the point was not taken in time. Assuming the correctness of the doctrine intimated in that case, we think its application should be rather carefully limited and not extended." Furthermore, in the case at bar no such incongruity exists between the word "abet" and the words "aid and assist."
Coming now to the question whether the word "abet" is so dissimilar to the words "aid and assist" as to be repugnant thereto, thus making necessary separate counts for "abetting" and "aiding and assisting," the Flynn case, supra, is relied on to substantiate the claimed repugnancy. There the defendant was generally charged that he did aid, abet or assist another in keeping at his hotel a place where persons might resort for gambling, etc. Chancellor Pitney, in analyzing these words, said: "The words `aid' and `assist' may be treated as synonymous; they both impart a contribution of effort. But `abet' has a somewhat different meaning and may import presence with instigation or encouragement towards the commission of the offense, but without aid or assistance therein." It is immediately observed that while the court points out "a somewhat different meaning" between aiding and abetting, and aiding and assisting and abetting, it does not charge them with being repugnant. That they are not synonymous is of no moment; the true test is whether they are repugnant. Webster's New International Dictionary defines repugnant as follows: "contradictory, irreconcilable, incompatible, *199 adverse." None of these synonyms can be applied here. Furthermore, a careful reading of the Flynn case demonstrates that the reversal turned not on any variance between the meaning of aiding and abetting, but rather on the ground that the indictment which contained two averments, one general and one specific, was defective because the latter did not accuse the defendant of any crime under the statute, the violation of which he was charged with. The general averment alleged the aiding, abetting or assisting in the keeping of a place to which persons might resort for gambling "in a certain form, namely, upon a slot machine," and the specific averment alleged that the defendant "did furnish, lease or loan to the said C.W. the said slot machine so used or to be used for gambling." The court, in commenting on the latter situation, stated: "In short, construing the alternative averment in the specific charge most favorably to the defendant, it accuses him of that which in and of itself is no offense, under the statute." The Flynn case cannot be urged as authority for the statement that the word "aid" or the word "assist" are repugnant to the word "abet."
The rule of law relating to the criticism here charged is therefore this: Crimes charged in statutes in the disjunctive may be pleaded in one count in an indictment conjunctively, unless the crimes are repugnant, in which instance they must be pleaded in separate counts.
It appearing from the discussion herein that the words "aid and assist" are not repugnant to the word "abet," it follows that when these words are pleaded conjunctively with reference to a statutory crime, such pleading is in conformance with the law in this State. Words will not be tortured out of their usual and accepted meaning. Jasion v. Preferred Accident Ins. Co. of N.Y., 113 N.J.L. 108, 172 A. 367 (E. & A. 1934).
The concluding charge is that the indictment is defective for failure to allege that the crime charged did not take place under the certificate system of betting outlined under the pari-mutuel statute, R.S. 5:5-22. The cases here relied *200 on are from the State of New York. It is to be observed that the New York statute differs from ours. State v. Morano, supra. The theory espoused by the New York cases is not adhered to in New Jersey.
Prior to 1940 the statute prohibiting bookmaking and maintaining a gambling place contained no exception whatsoever, R.S. 2:135-3. In 1940, subsequent to the constitutional amendment permitting horse races and pari-mutuel betting with legally established race tracks there was an amendment to R.S. 2:135-3 by adding to the prohibition of the statute the following: "Nothing in this section contained shall be construed to apply to pari-mutuel betting at race meetings as authorized by the Constitution of this State and any statute passed in pursuance thereof." L. 1940, c. 205, p. 862.
Thus, the exception is not within the enacting provision of the statute but it is, in fact, an addition thereto by amendment. (R.S. 2:135-6, 7 and 8 were similarly amended. L. 1941, c. 398.)
It is settled that an indictment for a statutory offense need not contain an averment that the defendant is not within an excepted clause unless the exception is found in the enacting or prohibitory clause of the act. If it be found in a separate substantive clause, and is not an essential part of the description of the offense, it is a matter of defense. Mayer v. State, 63 N.J.L. 35, 42 A. 772 (Sup. Ct. 1899); State v. Price, 71 N.J.L. 249, 58 A. 1015 (Sup. Ct. 1904); State v. Reilly, 88 N.J.L. 104, 95 A. 1005 (Sup. Ct. 1915); O'Regan & Schlosser, N.J. Criminal Practice, § 188, p. 346.
The indictment against the defendants charges that in the City of Bridgeton in the County of Cumberland they did on the 22nd day of June, 1948, and other days between that date and the 26th day of April, 1950, aid and abet five individuals in the operation of what is commonly known as a book on the running, pacing and trottings within or without this State of horses, mares and geldings. In a sense the indictments themselves negative the exception of the statute since they *201 set forth that the criminal acts took place in Bridgeton and there is no legalized pari-mutuel race track in Bridgeton, but this inferential negativing of the statute is entirely unnecessary under the doctrine of State v. Mayer and State v. Price, supra.

No. 5014 (CONSPIRACY)
This indictment charges that the defendants, Western Union, Frake and Donaldson, "unlawfully and corruptly did conspire, combine, confederate and agree together to make and take what is commonly known as a book, upon the running of horses, mares and geldings, contrary to the provisions of R.S. 2:119-1 * * *." Also alleged are three overt acts done in furtherance of the execution of the conspiracy.
R.S. 2:119-1 provides: "Any two or more persons who shall combine, unite, confederate, conspire or bind themselves, by oath, covenant, agreement or other alliance: a. To commit a crime * * * Shall be guilty of a conspiracy. * * *" R.S. 2:135-3, set forth in detail in the discussion of Indictment No. 5013, supra, makes it a crime to make or take a book upon the running of horses, mares or geldings. Indictments such as this are not uncommon. State v. Klausner, 4 N.J. Super. 427, 67 A.2d 468 (App. Div. 1949); State v. Lennon, 4 N.J. Super. 415, 67 A.2d 475 (App. Div. 1949), affirmed 3 N.J. 337, 70 A.2d 154 (1949); State v. Morano, supra.
The requirement for pleading an overt act is contained in R.S. 2:119-2, which provides: "No agreement to commit any crime * * * shall be deemed a conspiracy unless some act in execution of such agreement be done to effect the object thereof by one or more of the parties to such agreement."
It is first charged that the indictment is faulty because it fails to allege facts showing an agreement to commit a crime. This same criticism was leveled at Indictments No. 5012 and 5013 and has been disposed of contra to the contention of the defendants. (See cases cited under the discussion of the two previous indictments on this point.)
*202 It is next urged that the indictment does not allege in what jurisdiction or in what location the book was to be made. This ground lacks color. The indictment specifically states that the conspiracy took place on February 22, 1950, "at the City of Bridgeton, County of Cumberland. * * *" The gist of the conspiracy is the compact between and the confederation of the defendants to make book on the running of horses. The locality of the bookmaking is unimportant. Cf. Ames v. Kirby, 71 N.J.L. 442, 59 A. 558 (Sup. Ct. 1904). Here the locale is specifically designated.
Next it is said that the pleading must charge not only the statute violated by the agreement, which it does, R.S. 2:119-1, but also what particular subsection of the statute is alleged to have been violated. Not so. This indictment is grounded on a definitive statute, and it is so framed that upon inspection it discloses not only the nature of the crime but the particular crime intended to be charged, to wit, conspiracy to make a book. This is all that is required. State v. Ellenstein, 121 N.J.L. 304, 2 A.2d 454 (Sup. Ct. 1938); State v. McFeeley, supra. It is further said that the indictment is defective (a) because the allegations of overt acts are vague, indefinite and confusing, and (b) because the overt act is not alleged. This can hardly be. The absence of an allegation containing an overt act is one thing, and it is another to say that the overt acts pleaded are nebulous. The overt act against the Western Union charges that on February 22, 1950, at Bridgeton, New Jersey, by certain means and methods it permitted its telegraphic facilities and services at 82 East Commerce Street, Bridgeton, New Jersey, to be used in the making and taking of a book upon the running of horses. The overt acts against Frake and Donaldson charge them with the use of the aforementioned telegraphic facilities. The language is plain and incisive. It is neither vague, indefinite nor confusing. It seems much clearer than the criticism of it. No cases are cited to sustain the point just disposed of. However, it may be said that the overt act may or may not in itself be criminal, and in any event need not be set out with as much *203 particularity as is required when the indictment charges the direct commission of a crime itself, since conspiracy is the crime and the overt act may be relatively insignificant. State v. O'Brien, 136 N.J.L. 118, 54 A.2d 806 (Sup. Ct. 1947); State v. Smith, 56 R.I. 168, 184 A. 494 (Sup. Ct. 1936). The indictment presents with reasonable certainty the facts necessary to render the offense judicially apparent. This is all that is required from the pleading. State v. Ellenstein, supra.
It is next urged that the indictment fails to allege that any overt act was done subsequent to the agreement. This is predicated on the unique theory that because the indictment charges the agreement was made between the parties on the 22nd day of February, 1950, and the overt act is charged to have been done on the same day, it thus appears that the agreement and the overt acts were done simultaneously, and that the rule requiring the overt act to be subsequent to the agreement is offended. A plain reading of the indictment dissipates this contention. It charges a conspiracy and then in the allegation of the overt acts the following is stated: "* * * that in execution of the unlawful agreement and conspiracy between them * * * and to effect the object thereof * * *" the overt acts were done. The language of the indictment provides the sequence of events and is subject to no other construction than this  that the overt acts charged were committed after the conspiracy was formed, while it was still in existence and in furtherance of its unlawful purpose. Cf. Remus v. United States, 291 F. 501 (6 C.C.A. 1923), cert. denied, 263 U.S. 717, 44 S.Ct. 180. In any event, it ought to be remembered that there are 24 hours in one day, and if at the trial it appears that the overt act preceded the conspiratorial agreement, then proper action can be taken by the trial court. But here we are dealing with an indictment and not a trial. Instead of laboring in the dark, resort might be had by the defendants to bills of particulars. Rule 2:4-14. It cannot seriously be urged that the alleged defect will prejudice the defendants in maintaining their defense upon the merits. Cf. *204 State v. Morrissey, 11 N.J. Super. 298, 78 A.2d 329 (Cty. Ct. 1951).
"A motion to quash an indictment is addressed to the court's discretion, but ought not to be exercised when injustice might result to the state and where a refusal to exercise it deprives defendants of no substantial rights. * * *" State v. Lehigh Valley R.R. Co., 90 N.J.L. 372, 103 A. 685 (Sup. Ct. 1917).
The next criticism is that the indictment fails to allege an overt act done "to effect the object." The statute adverted to before, R.S. 2:119-2, provides that no agreement to commit any crime, save certain excepted crimes, shall be deemed a conspiracy "unless some act in execution of such agreement be done to effect the object thereof." It is here argued that even if the permitting of the use of the telegraphic facilities of the Western Union could constitute an overt act done to effect the object of the conspiracy, the pleading must charge both knowledge on the part of the Western Union of the illegal use of the facilities, and knowledge of the illegal purpose of the agreement. The pleading at bar does exactly this. The overt act charges that the Western Union "unlawfully and corruptly" permitted the use of its telegraphic facilities to be used in the making of a book upon the running of horses. The word "corruptly" implies moral turpitude and intentional wrong and is synonymous with actual and intentional wrongdoing. Burdick, Law of Crimes, supra, § 125; Worsham v. Hurchison, 66 Ga. 715 (Sup. Ct. 1880). In respect to this criticism, some observation should be made affecting the fundamental aspects of a conspiracy. In dealing with conspiracies, it must be observed that the gravamen of the offense is the agreement among the conspirators to commit an offense, i.e., the unlawful confederacy to do an unlawful act or a lawful act for an unlawful purpose, attended by an act of one or more of the conspirators to effect the object of the conspiracy. Thus, it is seen that it is the conspiracy itself which constitutes the crime, and the overt act may or may not in itself be criminal and may be relatively insignificant. U.S. v. Falcone, *205 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), affirming 109 Fed.2d 579; State v. O'Brien, 136 N.J.L. 118, 54 A.2d 806 (Sup. Ct. 1947). It is wholly unimportant whether the conspirators succeed or fail in the attainment of their agreement, for the fact, once established, that an attempt was made to attain the unlawful object, even by legal means, or the use of unlawful means to obtain a lawful object, stamps the agreement as a criminal conspiracy. State v. Herbert, 92 N.J.L. 341, 105 A. 796 (Sup. Ct. 1918). Thus, it is observed that the substantive crime is the conspiracy, and the unlawful agreement is the gist of it. So, a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. American Tobacco Co. v. U.S., 328 U.S. 781, 66 S.Ct. 1125 (1946). Overt acts only do not constitute the crime but become the basis. See R.S. 2:119-1(a). But something further is necessary in crimes other than arson, burglary, manslaughter, rape, robbery or sodomy, R.S. 2:119-2, namely, "some act in execution of such agreement" which must be done to effect the object thereof by one or more of the parties to such agreement. Such an act is characterized as an overt act, and becomes the basis of an indictable offense when, as the statute says, one of the parties takes a step in furtherance of the execution of the object. One such step is sufficient even if the object of the conspiracy be not obtained. These overt acts need not be enacted by all or any specified number of the conspirators. One will suffice. An indictable conspiracy is in its nature an attempt to commit an offense. Cf. State v. Hemmendenger, 100 N.J.L. 234, 126 A. 544 (Sup. Ct. 1924); State v. O'Brien, supra; Morrison v. People, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934); U.S. v. Falcone, supra. Measured by the law just stated, the pleaded overt acts allege the illegal use by the Western Union of its telegraphic facilities for the purpose of making a book, and thus supports the indictment.
It is next said that the indictment is vague and indefinite because the method by which the telegraphic facilities were used are not set forth. As to Western Union, it is stated *206 that the corporation "did permit the use and enjoyment of its telegraphic facilities and services"; that Frake "did permit the use and enjoyment of telegraphic facilities and services"; and as to the defendant, Donaldson, that "he did use, and enjoy the telegraphic facilities and services." These allegations do not seem hazy or confusing; certainly an indictment is no place to look for a scientific dissertation on the operation of a telegraphic system. Furthermore, too much significance is attached by defense counsel to the overt acts as pleaded. These acts may not in themselves be criminal in order to support the indictment and may, as a matter of fact, be relatively insignificant. State v. O'Brien, supra. It cannot be fairly argued that it is proper for Western Union to make book on horses, so if the corporation through its agents and others combine to do such very thing, then the agreement had an unlawful purpose, and if the indictment so charges an offense is stated.

No. 5016  (SENDING MESSAGES IN AID OF ILLEGAL BUSINESS. INDICTMENT RETURNED AGAINST WESTERN UNION ONLY)

The Indictment
Because a reading of the whole indictment is required to analyze the criticisms directed against it, the whole text is quoted.
"The Western Union Telegraph Company, a corp. on the first day of February, 1950, and on divers other days and times between that day and the sixth day of March, 1950, with force and arms, at the City of Bridgeton, in the County of Cumberland, aforesaid, and within the jurisdiction of this Court wilfully, knowingly and unlawfully did engage in the business of transmitting messages by means of telegraphy from James Notaro, of the City of Bridgeton, County of Cumberland, on the betting of certain horse races then and there being run on race tracks within and without this State, and did then and there knowingly transmit and carry the said bets on horse races at said race tracks by means of the said telegraphy to J.W. Donaldson, alias Leo Link, who was unlawfully engaged in the practice and pursuit of bookmaking in the Cities of Clifton and Passaic, in the County of Passaic, and State of New Jersey, and the *207 said Western Union Telegraph Company, a corp., did thereby further or promote the interest and unlawful pursuit of bookmaking then declared illegal by the Statutes of New Jersey and which was contrary to the form of Revised Statute of New Jersey 2:171-3 and against the peace of this State, the government and dignity of the same."

The Statute
This indictment is based on R.S. 2:171-3, the provisions of which are as follows:
"Any person, or any express, telephone, telegraph or other company or corporation, engaged in the business of carrying or transmitting packages, letters or communications within this state, whether by express, telegraph, telephone or any other means whatsoever, that shall knowingly carry any message of a kind which shall further or promote the interest of any unlawful pursuit, or enable a person to carry on any business or practice declared illegal by any statute of this state, shall be guilty of a high misdemeanor."
The act applies to persons or corporations engaged in specific businesses, and the defendant, Western Union, is engaged in one of the categories mentioned, to wit, in the transmission of communications by telegraph. The disjunctive criminal acts contained in the statute consist of the knowingly carrying of a message of a kind which (1) "shall further or promote the interest of any unlawful pursuit," or (2) which will "enable a person to carry on any business or practice declared illegal by any statute of this state."
The offense seems to be unknown at common law. By reason thereof it must be strictly construed, but this rule is not violated by adopting the sense of the words which best harmonizes with the object and intent of the Legislature as gathered from the whole context of the statute. State v. Hand, 71 N.J.L. 137, 58 A. 641 (Sup. Ct. 1904). The rule of construction stated does not subject the statute to any strained or unnatural construction, but it is to be interpreted by the aid of all ordinary rules for the construction of statutes so as to ascertain the legislative intent. Southerland, Statutory Construction, § 5606.

*208 Objections to the Statute

It is first urged that the statute is violative (1) of the due process clause of the Fourteenth Amendment of the United States Constitution, section 1 of which provides: "* * * nor shall any state deprive any person of life, liberty or property without due process of law * * *," and (2) of Article 1, paragraph 1 of the New Jersey Constitution which provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." This latter provision is identical with that of the Constitution of 1844, except for the substitution of the word "persons" in place of "men," and has been declared by the courts of this State to be the "due process clause" of our State Constitution. State v. Newark Milk Co., 118 N.J. Eq. 504, 179 A. 116 (E. & A. 1935).
What defense counsel fails to consider in his unilateral attack upon this legislation is that the statute contains separable disjunctive crimes. This, as will appear in the conclusions under the first query proposed herein, assumes significant proportions in the solution of the problem that presents itself to this court.
The basis of the criticism is that this penal statute is not sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. Cf. Lanzetta v. State, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) reversing State v. Pius, 120 N.J.L. 189, 198 A. 837 (E. & A. 1938), affirming 118 N.J.L. 212, 192 A. 89 (Sup. Ct. 1937). It is a fundamental rule of law that such a statute must be so written that intelligent men may know what acts of theirs will jeopardize their life, liberty or property. See dissenting opinion of Mr. Justice Reed in the Petrillo case, infra. For the foregoing reason, the statute is itself indicted by this defendant for being vague, indefinite and illusory, and in contravention of the due process clauses of the State and Federal Constitutions cited above.
*209 The attack strikes a familiar but formidable chord. If the criticism is valid, the statute should be stricken down as unconstitutional. If not, this court should not intervene. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448 (1948). In the lucubration attending the solution of this contention, the court is without benefit of any previous judicial declarations as to this particular statute. Resort must therefore be had to previous adjudications relating to comparable situations.

Purpose of Act
Presumably the legislative purpose was to render penal the act of any telegraph company in knowingly sending messages in aid of an illegal business. Such is the gist of the legislative expression. This is broken down into two disjunctive categories, one embracing the carrying, with knowledge, of a message of a kind which will "further or promote the interest of any unlawful pursuit," and the other contemplates the carrying, with knowledge, of a message of a kind which will "enable a person to carry on any business or practice declared illegal by any statute of this State." So, any telegraphic message which promotes the interest of an unlawful pursuit or enables a person to carry on a practice which contravenes a statutory offense, is labeled a crime. If either be a public wrong, then the enactment of the statute was a proper legislative function, and the power exercised is an attribute of sovereignty, provided, however, that the language is constitutionally certain.

Public Wrongs
At common law a wrong which public policy requires to be prosecuted is an indictable offense. 1 Wharton's Criminal Law (12th ed.), § 15. The police of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably *210 consistent with a like enjoyment of rights by others. 2 Cooley's Constitutional Limitations (8th ed.) 1223. Blackstone defines the public police and economy as "the due regulation and domestic order of the kingdom, whereby the inhabitants of a state, like members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious and inoffensive in their respective stations." 4 Bl. Com. 162. Jeremy Bentham, in his General View of Public Offenses, has this definition: "Police is in general a system of precaution, either for the prevention of crimes or of calamities."
What, then, is the test of determining a public wrong? The concept of a public wrong is the product of social evolution and whether an act has been or is deemed to be a public injury or menace depends upon the stage of civilization and the conditions which confront a people. In a crude age of society public wrongs are unknown, but when the social organization becomes complex then public wrongs are many. Likewise, the number and nature of public wrongs vary with the different ideals and forms of government and with the moral standards of the people. Thus, it happens that even in the same country some acts deemed public wrongs or crimes at one period of its history are no longer considered in a subsequent period, and that other acts once viewed as undeserving of punishment or even censure by the state are made criminal. Different conditions thus become the cause of different laws. Burdick, Law of Crime, § 3.

Power of a State to Create Criminal Offenses and Limitations Imposed Thereon.
The state is invested, in virtue of its police power  an attribute of sovereignty  with a large measure of discretion in the creation and definition of criminal offenses. The power is, of course, subject to constitutional restraints, and its exercise must needs be reasonable and not arbitrary or capricious. At common law an indictable offense consisted of a wrong which, in the general public interest, should be prosecuted and punished by the state. Such legislative acts *211 must, in the main, have reasonable relation to one of the needs which give rise to the exercise of the police power. And the constitutional requirements of "due process" and "equal protection of the laws" would be otherwise met if the statute creating and defining the offense lay down a definite, ascertainable standard of guilt, require an accusation in due form, and operate without discrimination on all persons and classes of persons similarly situated. Levine v. State, 110 N.J.L. 467, 166 A. 300, 302 (E. & A. 1933).
The touchstone is whether the text of the statute is "adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them." United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 300, 65 L.Ed. 516, 517, 14 A.L.R. 1045 (1921). See also, Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). "Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid. United States v. Sharp (Fed. Cas. No. 16,264), Pet. C.C. 118. Before a man can be punished, his case must be plainly and unmistakably within the statute." United States v. Brewer, 139 U.S. 278, 11 S.Ct. 538, 541, 35 L.Ed. 190 (1891); State v. Gaynor, 119 N.J.L. 582, 197 A. 360 (E. & A. 1938).
The Legislature is supreme in its proper sphere; the exercise of power by it is subject only to the restraints imposed by the Federal and State Constitutions, and those which are fundamental in the social compact. A legislative enactment should not be set aside unless its unconstitutionality indisputably appears. If there be a permissible doubt as to the existence of the constitutional limitation invoked against the validity of an act, the courts will not declare the act to be contrary to the Constitution. Attorney-General v. McGuinness, 78 N.J.L. 346, 75 A. 455 (E. & A. 1910); State v. Garden State Racing Ass'n., 136 N.J.L. 173, 54 A.2d 916 (E. & A. 1947). The court cannot substitute its conception *212 of sound public policy for that entertained by the Legislature, if there be no disregard of a constitutional mandate. State v. Newark Milk Co., supra.

First Query: Whether the offenses set forth in the statute, to wit: The carrying of any message of a kind which shall further or promote the interest of any unlawful pursuit, or enable a person to carry on any business or practice declared illegal by any statute of this state, are disjunctive and separable.
Two matters of transcendental importance must be perceived at this juncture. First, that the statute consists of two mutually exclusive alternatives, disjoined by the Legislature, and second, that the indictment is predicated on the second disjunctive which contemplates a practice declared illegal by statute, to wit: bookmaking, R.S. 2:171-3. That the partial statutory words appearing in the first disjunctive, "did thereby further or promote the interest and unlawful pursuit" appear in the indictment is of no moment. They are in this pleading merely words of description used only for the purpose of categorizing and describing "business or practice" declared illegal by the designated statutory crime of bookmaking, and can be rejected as surplusage, as they are not necessary ingredients in the offense charged. Cf. State v. Kern, 51 N.J.L. 259, 17 A. 114 (Sup. Ct. 1889); State v. Then, 118 N.J.L. 31, 190 A. 495 (Sup. Ct. 1937), affirmed 119 N.J.L. 429, 196 A. 740 (E. & A. 1938). Such surplusage does not affect the defendant adversely, does not destroy the effect of the essential crime charged, and is rejected. 42 C.J.S., § 155. Under such a posture of events, an accused affected by one portion of a statute may not plead the invalidity of another portion of the same statute not applicable in his case, where the invalidity of the portion questioned will not render void the entire act, or at least some provision that does not affect him adversely. Ibid.
In the indictment it can be preliminarily observed that while the phrase "unlawful pursuit" used in the first disjunctive *213 might be attacked as being nebulous and indefinite, nonetheless, the words used in the second disjunctive are identifiable, clear and unmistakable in meaning as they embrace statutory specificity, to wit: "any business or practice declared illegal by any statute of this state." It is axiomatic, of course, that a criminal statute must give a clear and unmistakable warning as to the acts which will subject one to criminal punishment. And courts are without power to supply that which the Legislature has left vague. But this salutary principle does not mean that if a statute is vague as to certain criminal acts but definite as to others the entire statute must fall. Nor does it mean that in the first case involving the statute to come before us we must delineate all the prohibited acts that are obscure and all these that are explicit. See concurring opinion of Mr. Justice Murphy in Screws v. U.S., 325 U.S. 91, at p. 135; 65 S.Ct. 1031, at p. 1052 (1935).
From a careful reading of the statute, I consider that the disjunctive sections appearing therein are separable and independent of each other, and that this was the legislative purpose. Assuming, arguendo, that the first disjunctive phrase is so vague that it fails to establish a proper legal criteria, this does not benefit the defendant. The unconstitutionality or invalidity of a part of a statute does not render another part invalid, where the two parts are separable and are not dependent on each other. Cf. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855 (1936). The entire statute will not be declared void because of some provisions which are unconstitutional, if such provisions may be omitted without substantially affecting the legislative purpose. Board of Health of New Jersey v. Schwarz Bros. Co., 86 N.J.L. 170, 90 A. 1061 (E. & A. 1914), affirming 84 N.J.L. 500, 87 A. 147 (Sup. Ct. 1913); Collins v. Sauer, 89 N.J.L. 139, 97 A. 897 (Sup. Ct. 1916); Albany County Sup'rs. v. Stanley 105 U.S. 305 (1881); Am. Jur., § 152.
The second disjunctive phrase contains statutory specificity, which has two purposes, to give due notice that an *214 act has been made criminal before it is done, and to inform one accused of the nature of the offense charged so that he may adequately prepare and make his defense. More than this certainly the Constitution does not require. Cf. concurring opinion of Mr. Justice Rutledge in the Screws case, supra.
Ergo, because the second disjunctive is separable from the first, as the former contemplates acts described with certitude, to wit, statutory crimes, I conclude that the second disjunctive satisfies the constitutional requisites, and as to indictments based on it, which otherwise satisfy the rules of pleading, that they cannot be criticized for being vague or indefinite.

Second Query: Whether the first disjunctive mentioned in the statute is so vague and indefinite that it fails to define the offense or to give reasonable standards for determining guilt.
It has been here concluded that the indictment is based on the second disjunctive in the statute which is constitutionally valid, so that further discussion as to the first disjunctive, which is not in issue, may be academic or moot; but because it has not been the subject of prior judicial pronouncement, I choose to dispose of the objections raised against it.
Such provision of the statute could not be sustained if the court agreed with the contention that persons of ordinary intelligence would be unable to know what constituted the sending of a message in aid of an illegal business. Cf. Connally v. General Construction Co., supra. As defense counsel points out, there are many factors that might be considered in determining just what constitutes messages of the type referred to in the statute; however, the same thing may be said about most questions which must be submitted to a court in order to enforce statutes. Clearer and more precise language might have been framed by the Legislature to express what is meant by the carrying of a "message of a kind which shall further or promote the interest of any unlawful pursuit." *215 But no better language has been suggested to effectively carry out what appears to have been the legislative purpose. The argument seems to be that it is impossible for a jury or court ever to determine what constituted such illegal messages, and that therefore no statutory language could meet the problem the Legislature had in mind. If this argument be accepted, the result would be that no Legislature could make it an offense to send illegal messages via telegraph, however desirable a Legislature might consider suppression of the practice to be. Cf. U.S. v. Petrillo, 332 U.S. 1, 67 Sup. Ct. 1538 (1947). In the last mentioned case, Mr. Justice Black, speaking for the court in considering a federal statute which made it unlawful to coerce a broadcasting company to employ "any person or persons in excess of the number of employees needed by such licensee to perform actual services," in answering objections similar to those raised here, said:
"The Constitution presents no such insuperable obstacle to legislation. We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. Robinson v. United States, 324 U.S. 282, 285, 286, 65 S.Ct. 666, 668, 669, 89 L.Ed. 944 [1945]. It would strain the requirement for certainty in criminal law standards too near the breaking point to say that it was impossible judicially to determine whether a person knew when he was wilfully attempting to compel another to hire unneeded employees. See Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330 [1945]; United States v. Ragen, 314 U.S. 513, 522, 524, 525, 62 S.Ct. 374, 377, 378, 379, 86 L.Ed. 383 [1942]. The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards.
The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more."
*216 Gambling is injurious to the morals and welfare of the people. Therefore, it is the duty of the State and it is within the scope of its police power to suppress it. It could never have been contemplated by the framers of the Federal Constitution that the hands of the states were to be tied so that they could not protect themselves from such vices, if one of the participants chanced to use an interstate vehicle of commerce for carrying on the business. 153 A.L.R. 469. That the bets on particular horses in particular races were received, processed and transmitted via telegraph does not lessen the offense. Clearly, it was the intent, and within the rights of the Legislature of the State of New Jersey, to consider as illegal the knowingly taking and sending of bets on horses via telegraph. See article entitled "The Suppression of Bookie Gambling by a Denial of Telephone and Telegraph Facilities," p. 176, appearing in The Journal of Criminal Law and Criminology, published by Northwestern University School of Law, July-August 1949.
The issue here seems to turn on the thought that the disjunctive in question is so framed that it would require a court or jury on occasions to determine the question of reasonableness. This in itself is not sufficient to make it too vague to afford a practical guide to permissible conduct. Cf. Nash v. U.S., 229 U.S. 373, 33 S.Ct. 780 (1913); Musser v. State of Utah, 333 U.S. 95, 68 S.Ct. 397 (1948). In United States v. L. Cohen Grocery Co., 255 U.S. 89, 41 S.Ct. 300, 14 A.L.R. 1045 (1921), the United States Supreme Court held a conviction under § 4 of the Lever Act, 41 Stat. 297, 298, unconstitutional because the statute left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against," and because an "attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury." In International Harvester Co. v. Kentucky, 234 U.S. *217 224, 34 S.Ct. 856 (1914), the same court expressed the view that assurance that the state statute there in issue was complied with called for "gifts that mankind does not possess." And in Collins v. Kentucky, 234 U.S. 638, 34 S.Ct. 925 (1914), the same statute was said to call for a determination of conduct "not according to the actualities of life, or by reference to knowable criteria, but by speculating upon imaginary conditions."
No such unworkable standards are involved here. The language of the statute is not vague, nor does it delegate policy making powers to either court or jury. The carrying via telegraph of a message which furthers or promotes the interest of an unlawful pursuit, is not beyond the ready comprehension either of persons affected by the act, or juries called upon to determine violations. Surprised innocence is not an attribute of one who persists in promoting the interest of a pursuit known to be unlawful even to a school boy. Nor does the particular mode of transmission alleged in the indictments, namely, the taking of bets on horse races and the transmission of them, so transform the nature of the offense as to make the actors less aware that they are committing it, or juries less competent to detect it. A finding of unconstitutional certainty in this section of the act as applied here would be a negation of experience and common sense. It would further clothe the corporate defendant with an immunity not enjoyed by the ordinary bookmaker, and provide it with a license to take bets, be a party to bookmaking, and conduct the same practices commonly carried on by bookmakers which are expressly prohibited by statute. A consistent, knowledgeable course of illegal conduct furnishes a poor springboard for a cry of invasion of constitutional rights.
On no construction can the statutory provision here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence. Cf. Gorin v. United States, 312 U.S. 19, 61 S.Ct. 429 (1941); Hygrade Provision Co. v. Sherman, *218 266 U.S. 497, 45 S.Ct. 141 (1925); Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323 (1918).
The obvious delimiting words of the statute are those relating to the knowingly carrying of such message. This requires those prosecuted to have acted in bad faith. The sanctions thus apply only when scienter is established. Cf. Gorin v. U.S., supra. Numerous cases decided by the United States Supreme Court and in other jurisdictions, have been referred to by counsel for the defendant in their brief supporting the theory that this legislation runs afoul of the due process clause because it fails to give adequate guidance to those who would be law abiding, to apprise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused. It is the element of scienter which distinguishes this case from those cited by defense counsel in support of the contentions urged. No more apt language can either be created by pen or found in the reported cases, than that of Mr. Justice Douglas in the Screws case, supra, where, in dealing with the element of knowledge, which distinguished the Screws case from the Cohen Grocery Co. and the Connally cases, supra and infra, and which latter cases defendant relies heavily upon, the court said:
"The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. See United States v. L. Cohen Grocery Co., supra. But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware. That was pointed out by Mr. Justice Brandeis speaking for the Court in Omaechevarria v. Idaho, 246 U.S. 343, *219 38 S.Ct. 323, 62 L.Ed. 763 [1918]. An Idaho statute made it a misdemeanor to graze sheep `upon any range usually occupied by any cattle grower.' Rev. Codes Idaho, Sec. 6872. The argument was that the statute was void for indefiniteness because it failed to provide for the ascertainment of boundaries of a `range' or for determining what length of time was necessary to make a prior occupation a `usual' one. The Court ruled that `any danger to sheepmen which might otherwise arise from indefiniteness, is removed by section 6314 of Revised Codes, which provides that: "In every crime or public offence there must exist a union, or joint operation, of act and intent, or criminal negligence."' Id., 246 U.S. at page 348, 38 S.Ct. at page 325, 62 L.Ed. 763. A similar ruling was made in Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 [1925]. The charge was that a criminal statute which regulated the sale of `kosher' meat or products `sanctioned by the orthodox Hebrew religious requirements,' Penal Law N.Y., sec. 435, subd. 4, was unconstitutional for want of any ascertainable standard of guilt. The Court speaking through Mr. Justice Sutherland stated, `* * * since the statutes require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such a requirement.' 266 U.S. at pages 502, 503, 45 S.Ct. at page 143, 69 L.Ed. 402. In United States v. Ragen, supra, we took that course in a prosecution for willful evasion of a federal income tax where it was alleged that the defendant had deducted more than `reasonable' allowances for salaries. By construing the statute to require proof of bad faith we avoided the serious question which the rule of United States v. L. Cohen Grocery Co., supra, might have presented. We think a like course is appropriate here.

* * * * * * * *
The constitutional requirement that a criminal statute be definite serves a high function. It gives a person acting with reference to the statute fair warning that his conduct is within its prohibition. This requirement is met when a statute prohibits only `willful' acts in the sense we have explained. One who does act with such specific intent is aware that what he does is precisely that which the statute forbids. He is under no necessity of guessing whether the statute applies to him (see Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 [1926]) for he either knows or acts in reckless disregard of its prohibition of the deprivation of a defined constitutional or other federal right. See Gorin v. United States, 312 U.S. 19, 27, 28, 61 S.Ct. 429, 433, 434, 85 L.Ed. 488 [1941].

* * * * * * * *
We take the course which makes it possible to preserve the entire Act and save all parts of it from constitutional challenge. If Congress desires to give the Act wider scope, it may find ways of doing so. Moreover, here as in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044 [1940], we are *220 dealing with a situation where the interpretation of the Act which we adopt does not preclude any state from punishing any act made criminal by its own laws. Indeed, the narrow construction which we have adopted more nearly preserves the traditional balance between the States and the national government in law enforcement than that which is urged upon us." (Italics ours.)
I am therefore led to the conviction that the first disjunctive does not inveigh against the mentioned provisions of the Federal or State Constitutions.
The motion on this score is denied.
The constitutionality of the statute is next attacked on the grounds that it violates Article I, Section 10 of the Federal Constitution, and Article IV, Section VII, paragraph 3 of the New Jersey Constitution. Both prohibit this State from passing ex post facto laws. This criticism is bottomed on the curious thought that this statute comes within the province of such prohibited legislation because no conviction can be had until a judicial construction is made thereon. If such be the law, the first offender under any newly promulgated law will be excused. The situation in the case at bar is not within the contemplation of these constitutional provisions. Cf. State v. Rowe, 116 N.J.L. 48, 181 A. 706 (Sup. Ct. 1935), affirmed 122 N.J.L. 466, 5 A.2d, 697 (E. & A. 1939); Sutherland, Statutory Construction (3rd ed.), § 2301, et seq.
It is next urged that the statute is unconstitutional under Article III, paragraph 1, and Article IV, Section I, paragraph 1 of the New Jersey Constitution, which vests the legislative power in the Legislature, and prohibits the exercise by the judiciary of legislative powers. This contention has been fully treated in the first attack on the statute herein. The statute does not delegate policy-making powers to the court. Cf. U.S. v. Ragen, supra.
The next point is that the indictment pleads conclusions rather than essential facts, and this charge is made even though the indictment follows the statutory language. Not so. A similar attack has been made upon Indictment No. *221 5013, and the pertinent law has already been stated. State v. Tachin, supra; State v. Riggs, supra; State v. Sweeten, supra, Rule 2:4-14; State v. Schmid, supra.
Next in line it is contended that the indictment is defective because the offense is not alleged to have been committed in this jurisdiction. The indictment charges that on the dates mentioned therein, the defendant, Western Union, at the "City of Bridgeton, in the County of Cumberland, aforesaid, and within the jurisdiction of this Court" committed the offense complained of. (The text of the indictment is set forth in detail, supra.) The language is clear and the criticism is untenable.
The next point urged is that the indictment fails to allege through what agent or agents the Western Union is charged to have acted. It is undisputed in this State that a corporation may be indicted for its criminal acts. Joseph L. Sigretto & Sons v. State, supra; Burdick on Crimes, § 174. Coming now to the question whether it is necessary for the indictment to allege either the commission of the offense by the corporation via an agent, or the name of such agent, such allegations are unnecessary. Wharton's Criminal Law (11th ed.), § 286, pp. 358, 359. The indictment may set out the facts either according to their legal import or the outward form at the pleader's election. When a corporation performs an act through its agent, as it must, the act in law is that of the corporation, and the pleader may, if he chooses, so allege it. Bishop's New Criminal Procedure (2nd ed.), § 332.
The last complaint registered is that the indictment lacks certainty, fails to inform the accused of the accusation, is confused, vague, indefinite and unintelligible. This embraces a multitude of criticisms, but all have been similarly made against the other indictments treated in this opinion. These charges are without foundation.
All motions made to quash the indictments under consideration herein are denied.